## Carey *et al. versus* Bright *et al.*

1. A firm confessed judgment to three creditors for themselves and in trust for other creditors; personal property of the firm was sold by the sheriff under the judgment, and bought by the plaintiffs: the firm then sold property to another which was claimed to have been sold under the judgment. In trover by the first against the second vendee, one of the firm was not a competent witness.

2. The second vendee was lessor of the debtor and the goods in contest were on the premises; notice to the sheriff by the lessor's attorney that he claimed rent out of the proceeds of sale was evidence that the lessor had notice of the sale.

3. A plaintiff may, if he pleases, with the court's permission, anticipate a defendant's case and defeat it.

4. The court may, in their discretion, regulate the order in which evidence shall be given.

5. To constitute a good levy the personal property levied on should be in the power, or, at least, in the view of the officer, at the time it is made.

6. The meaning of a term or name given to any particular class of objects

[Carey *v.* Bright.]

or property in a trade or business, may be proved by persons engaged in such trade or business, when that term or name is used in a contract, whether verbal or written.

7. An agent having received possession of a chattel for his principal is not bound to deliver it to the true owner, and a refusal by him thus explained, is not evidence of conversion ; but he is bound to prove the explanation.

8. The taking of the property of one by assignment from another who has no authority to dispose of it is a conversion.

9. Where a partnership is carried on by two different firm names, a judgment against either firm will support an execution against the partnership effects, and a sale under it will pass the title of all the partners.

10. In a suit against a firm the non-joinder of dormant partners as defendants cannot be pleaded even in abatement.

11. Under a judgment against the ostensible partners in the firm name the interest of the partners not named will pass to the sheriff's vendee.

12. In trover the court, after stating the ordinary rule as to the measure of damages, added : " but the jury are justifiable in going further when there has been an outrage in the taking, or vexation and oppression in the detention as a compensation to the party injured." There was nothing in the case to justify the jury in applying any but the ordinary rule. *Held*, to be error.

January 23rd 1868. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. STRONG, J., at Nisi Prius.

Error to the Court of Common Pleas of *Schuylkill county :* to January Term 1865, No. 226.

This was an action of trover to June Term 1863, in which George Bright, William H. Schall and Walter Sedgwick were plaintiffs, and Henry C. Carey, El. Hart and Griffith T. Jones were defendants.

The action was brought for the conversion of certain personal property used about collieries, which the plaintiffs claimed to have purchased at sheriff's sale as the goods of the firm of Kirk & Baum : the defendants claimed the goods by virtue of a sale by Kirk & Baum to them.

On the 1st of July 1852, Henry C. Carey, one of the plaintiffs, Abraham Hart and Eliza C. Baird leased to Enoch W. McGinnes for twenty years two collieries on the " St. Clair tract," in Schuylkill county, known as the " Shaft Colliery" and the " Slope Colliery." The rent was to be paid at a rate per ton on the coal mined ; the lessors to pay $18,000 towards improvements, any additional cost to be paid by the lessee, who was not to assign the lease without the consent of the lessors, with other covenants not material here.

On the 21st of September 1855, McGinnes, with the consent of the lessors, assigned to Kirk & Baum all his interest under the lease, " and also all steam-engines, pumps, fixtures, machinery, drift-cars and railroads, iron, mining tools and all other personal property of any description heretofore used by me at the St. Clair Colliery, including both slope and shaft, and in any way appurtenant thereto." Kirk & Baum on the same day by writing

accepted the transfer, and bound themselves to perform all the covenants of McGinnes in the lease.

On the 15th of February 1859, the same lessors made a new lease to Kirk & Baum of the same collieries for twenty-five years; the lessees not to remove any machinery or fixtures then at the collieries or thereafter to be put there, except when it had become unnecessary or other machinery had been substituted; the lessees were to carry on the collieries according to the most approved practice of good miners, they were not to mortgage, assign, &c., the lease without the consent of the lessors; and the lease or the premises, or any estate or interest of the lessees, should not be conveyed or passed to any person "by any judgment, &c., or any execution or any other act or operation of law," without the consent of the lessors. On the determination of the lease from any cause, the lessors to have the right, if they chose, to take all or any part of the machinery and fixtures then at the collieries at a valuation fixed by appraisers chosen by the parties, the valuation to be paid to the lessees, if they should have performed their covenants; if the machinery, &c., or any part should not be taken by the lessors, the lessees to have the right to remove it; with covenants for re-entry on breach of any of the covenants, which should not preclude their right to recover the rent in arrear or damages for breaches.

On the 21st of April 1859, Kirk & Baum, with the consent of their lessors, assigned by endorsement on the lease to H. K. B. Ogle, H. S. Gross and Jonathan Clark two undivided sixth parts " of, in and to the within lease and articles of agreement, and all the several subjects thereof and the premises thereby demised and described, and the rights, &c., appurtenant thereto, and all the outside fixtures and improvements for hoisting, break-ing and screening coal, all schutes, steam-engines, machinery, pumps, drift-cars, railroads, mining tools, iron, mules, wagons and other personal property of any and every description whatsoever, whether herein enumerated or not, belonging to us and used by us on and after the 1st day of January 1859 at and upon the said premises or in any way thereto appurtenant in the complete work-ing condition of the same as and for a colliery, and all our estate, right, title and interest of, in and to the said two undivided sixth parts thereof," &c.

The lessees at the same time were working the "Rainbow Colliery" under a lease from other lessors. The lessees and their transferees did business in Schuylkill county as Kirk & Baum, and in Philadelphia as Baum, Ogle & Co.

On the trial before Ryon, P. J., the plaintiffs gave in evidence a judgment entered September 6th 1861 in the Common Pleas of Schuylkill county by an agreement in an amicable action at the suit of "George Bright, Walter Sedgwick and William H.

Schall for themselves and in trust for Charles L. Boone, E. & G. Brooke, William Silliman and others v. James S. Kirk and John E. Baum, doing business in the firm name of Kirk & Baum." The judgment was for $61,026.89, and the agreement contained the names of the creditors in trust for whom it was given, including individual debts of Kirk and Baum, with the amount of their claims respectively. A fi. fa. on this judgment was issued the same day, and levies were made at the Rainbow Colliery, at the Slope Colliery, at the Shaft Colliery, at Port Carbon and at Pottsville, the last being of office furniture exclusively, and all as the property of J. S. Kirk and J. E. Baum, trading as Kirk & Baum.

The sheriff returned, "September 20th 1861. Personal property of defendants levied on, sold at the Rainbow Colliery for the sum of $1592; at the slope on St. Clair tract for the sum of $974, and at the shaft on· the St. Clair tract for the sum of $1039.75, making in all the sum of $3605.75, and proceeds of sale applied as follows, to wit: to cost on this writ $42.88; to rent claim of owners of the St. Clair tract $184.47, and on account of this debt $3378.40,· and further proceedings stayed by plaintiffs' attorney."

The plaintiffs further gave in evidence the deposition of C. Morris, taken November 30th 1863; he said, "I was in Mr. Kirk's office; Sedgwick and Griffith T. Jones were there; Sedgwick told him he wanted to move the property from the shaft; Mr. Jones told him that he could not—that he had orders not to let anything .be moved from there; he said he had orders from Mr. Hart not to let the property go from there; at the time Griffith T. Jones had charge of the shaft or slope as foreman or agent; it is going two years this winter; Mr. Jones spoke of having received orders or a letter from Mr. Hart; think Jones had been there a couple of weeks or so."

They further gave evidence what personal property was about the two collieries in and about the month of January 1862;· that at the slope had been appraised by the witnesses at $4842.62, and sold by the sheriff for $559; that at the shaft appraised at $8070.56, and sold for $537.75. After the sheriff's sale El. Hart & Co. took possession; the sheriff did not go into the mines at the sale. Bowen, the deputy sheriff, testified that he made the sale, and saw all the property at and before the time he sold, except some drift cars which were under ground; the whole was sold to the plaintiffs; witness said he did not make the levy; left everything with purchasers, but did not deliver formal possession.

John Holmes testified, H. C. Carey ordered him in the presence of Kirk to take possession of the property in dispute; Kirk gave witness possession. The plaintiffs offered James S. Kirk as a witness; after examination on his voir dire, he was objected

to by defendants because of interest, but admitted by the court and a bill sealed. Kirk then released to the plaintiffs all his right to the property in controversy; the defendants excepted to his admission after the release and bill was sealed. There were four other bills of exception to the testimony of Kirk.

The plaintiffs under objection and exception gave in evidence a notice dated September 19th 1861, from E. O. Parry, Esq., attorney of lessors, to the sheriff, that there were due to the owners of the St. Clair tract $5236 rent, which they claimed from the sale of any property liable for the same. In pursuance of this notice, Mr. Parry received from the sheriff and paid to the landlord $184.47.

The plaintiffs having closed, the defendants called J. P. Hobart, the sheriff, who testified: "I have no distinct recollection of making the levy in the suit against Kirk & Baum; I have no recollection of having made the levy personally; my impression is that Mr. Bowen made the levy." The defendants then proposed to ask the witness whether he was ever down the slope or shaft at the St. Clair collieries, to be followed by evidence that at the time of the levy and up to the sheriff's sale, a large portion of the property embraced in the levy and sale was in the mines out of sight, reach and power of the sheriff, and H. C. Carey and others purchased this property in the mines of Kirk & Baum and other owners after the date of the sale and before this suit. On the plaintiffs' objection the court rejected the offer and sealed a bill of exceptions. The defendants gave in evidence, against the objection of the plaintiffs, the above-mentioned leases and transfers; also an agreement, dated December 16th 1861, by which it was agreed:

"1. That Kirk & Baum and Baum, Ogle & Co. sell and assign all their interest in the shaft and slope collieries to Henry C. Carey, Abraham Hart and Eliza C. Baird, the lessors in the lease.

"2. Henry C. Carey, Abraham Hart and Eliza C. Baird to pay over to the Miners' Bank of Pottsville, one-third of the net rents hereafter received from the said collieries until the sum of $40,000, with interest from this date, be paid to the bank.

"3. The lessors to release Kirk & Baum, and Baum, Ogle & Co., for all claims for rent, to pay the wages of miners and laborers at the slope and shaft collieries and the mortgage of Henry C. Baird. The claims of miners and laborers to be paid as per list furnished.

"4. The Miners' Bank of Pottsville to release Kirk & Baum, and Baum, Ogle & Co. from all claims, retaining, however, as the property of the bank the collaterals the bank now hold and given to them by Kirk & Baum and Baum, Ogle & Co."

They gave in evidence the receipt of Baum, Ogle & Co., dated

[Carey *v.* Bright.]

March 25th 1862, to the Miners' Bank of Pottsville, for four notes of Baum, Ogle & Co., amounting to $45,672, to Kirk & Baum, and endorsed by them, which notes were delivered up in pursuance of the fourth paragraph of the foregoing agreement; also mortgage to Henry C. Baird, amounting on the 2d of Decembes 1861 to $8210.67; also amount paid miners and laborers, $1625.43.

The defendants then proposed to prove that " the term colliery means a place where coal is dug or mined, embraces all the movable property at the mines, used or placed there to be used in the working of the mines, is so understood by all persons engaged in mining, and has been so understood by all engaged in the mining interest in Schuylkill county, for the last twenty-five years." The offer was objected to by the plaintiffs; rejected and bill sealed.

They gave evidence by Ulmer, the book-keeper of Baum, Ogle & Co. In their books in the city they did not know Kirk & Baum; the accounts in their books were "Pottsville Office Account;" they received weekly statements of the business at the mines, charging the Philadelphia office with the Pottsville office account for coal sent; an order for coal given at Philadelphia office was sent directly by Kirk & Baum to the person ordering it, the bill made out in the name of Baum, Ogle & Co., and collected by them; the mining expense account was kept in Pottsville; the money was raised through drafts by Kirk & Baum on Baum, Ogle & Co.

The defendants then offered to prove the valuation of the collieries in reference to their capabilities and value, and that the price mentioned in the agreement of December 16th 1861 was then a full price for the lease, fixtures and all the movable property at the collieries. The offer was objected to by the plaintiffs, and rejected, and a bill of exceptions sealed.

The defendants offered to prove by John Holmes, who took possession of the mines for Carey on the 16th of December 1861, that when he took charge of the mines they were in an unworkable and pretty dilapidated condition, and would cost many thousand dollars to repair. The offer was objected to by the plaintiffs, rejected and a bill of exceptions sealed.

The plaintiffs in rebuttal offered to prove that at the time the contract was made, and before the agreement to surrender the lease, Henry C. Carey, who acted for the landowners, had notice that the personal property at the mines had been sold by the sheriff, and that the lessees had no power over it. This was objected to by the defendants, admitted and a bill of exceptions sealed.

The defendants submitted twenty points.

1. The taking possession by Carey of the property at the

collieries under the agreement of December 16th 1861 was lawful, and not tortious.

2, 3, 4, 5, 10, 11 and 12. There was no evidence of a tortious conversion by Carey, Jones or El. Hart.

6, 14, 15. The property in controversy belonged to Kirk. Baum, Ogle, Gross and Clark, and a sale under a judgment confessed by Kirk & Baum could sell only their interest in the partnership; a levy upon articles, part of the firm assets, would not carry the title to them, nor give the plaintiffs a right of .possession.

7, 8, 9. There was no levy by the sheriff of the property in the mines or of any which he did not reduce to possession.

13. There is no estoppel in this case.

16. If the sheriff's sale was intended to hinder, &c., Carey, it is void against Carey, and the plaintiffs cannot recover.

17, 18. The term "colliery" included all movable property used at places for mining coal, and is not limited to the lease, fixtures, &c., and the agreement of December 1861 was an assertion of title.in Kirk & Baum of all that constituted collieries, and parol evidence in contradiction of such assertion should be rejected by the jury.

19. The possession of the property not removed from the demised premises continued in all the members of Baum, Ogle & Co., notwithstanding the sheriff's sale, and the plaintiffs never got possession of it.

20. There is no evidence of the assent by Ogle, Gross or Clark to the judgment confessed by Kirk & Baum, and the fact that the judgment included $8000 of the private debts of Kirk & Baum is evidence of the dissent of Ogle, Gross and Clark.

The court, after stating the leading facts, charged :—

" The first question presented is, what interest in this personal property passed to the plaintiffs in this suit by the sheriff's sale.

" The parties composing the firm of Kirk & Baum in·this county were conducting the business of selling coal in Philadelphia under the firm name of Baum, Ogle & Co.    The same parties were therefore carrying on two separate businesses, but each business conducted under a different name—in Schuylkill county the mining, preparing and shipping the coal to market were done under the name of Kirk & Baum, and the selling of the coal and collecting the bills were done in Philadelphia under the firm name of Baum, Ogle .& Co., or in other words, the same parties composed two separate firms for business reasons.    It does not appear that any of the partners but Mr. Kirk had anything to do in the management of the business in this county, nor does it appear that any knowledge of others being in the firm of Kirk & Baum than James S. Kirk and John E. Baum, was possessed by any one but the partners themselves.    The business was done here by Mr. Kirk

[Carey v. Bright.]

as the active and managing partner, in his name and Mr. Baum's. Mr. Baum and other partners resided in Philadelphia. There is no evidence that Bright, Schall & Sedgwick and the other creditors named in the judgment, knew that Gross, Ogle and Clark were members of the firm of Kirk & Baum at the time the debts were contracted or at the time the judgment was confessed. It is true the judgment contained debts due by the firm of Kirk & Baum, and Baum, Ogle & Co., and about $8000 debts due by James S. Kirk and John E. Baum, while doing business by themselves as Kirk & Baum, or individually, but the mere fact that the judgment included Baum, Ogle & Co.'s debts though it would give notice to the parties that Kirk & Baum were members of that firm, that fact would not necessarily give notice that Gross, Ogle & Clark were members of the firm of Kirk & Baum. Partners who are merely passive in the firm, whose names are not known or do not appear as partners in contradistinction to those who are active and conduct the business of the firm as principals, are called dormant partners. And it is at the option of the plaintiff in such cases either to join the dormant partner in the suit against the partnership or to omit him; and the joinder or non-joinder will not constitute any objection to the maintenance of the suit.

" If this was the fact that Kirk, the managing partner in Schuylkill county, and Baum were the ostensible partners, and Gross, Ogle & Clark were dormant or secret partners, this judgment being for debts of the firm and in the firm name would bind all the partners so far at least as to bind their interest in this personal property after the sale by execution. But it is not necessary to decide whether Kirk & Baum was a firm composed of ostensible and dormant partners. That one partner cannot confess a judgment to bind his copartner even for a firm debt, is a conceded legal principle, and the reason is that by the contract of partnership, each partner is constituted a general agent for the other only as to all matters within the scope of the partnership business, and has communicated to him, by virtue of that relation, all authority necessary for carrying on the partnership and all such as is usually exercised by partners in that business in which they are engaged.

" But it does not follow from this that a judgment confessed by one partner in the name of the firm for a firm debt will not sell the personal property of the firm. A sale of personal property belonging to a firm upon an execution, issued on a judgment obtained against one of the members for a firm debt, in a suit against the firm, passes a perfect title to the purchaser, and it makes no difference whether the judgment was obtained adversely or by confession. This is founded upon reason as well as authority. A sale by execution is a mode of applying the assets of the debtor to the payment of his debts. It is involuntary, to be sure,

[Carey *v.* Bright.]

but what matters it whether the application is made voluntarily or by process of law ? In the application of firm assets for the payment of firm debts, the equities of the creditors must be worked out through the partners, and hence, while the partnership property remains, either partner may compel its application to the firm debts, and creditors cannot question the mode or regularity of the appropriation ; they will not even be permitted to make objection to a judgment because it may have been given by one partner in the name of the firm for a firm debt. It is only the non-assenting partner that can question the validity of the judgment, and he is permitted to do it because if the judgment was permitted to stand it would bind his separate person.

" If the non-assenting partner does not intervene, but permits the judgment to stand against the firm without having it restricted to the person and interest of the partner confessing the judgment, but lies by until after sale by the sheriff of the personal property of the firm by the judgment, third parties cannot question the regularity of the judgment.

" The name of the firm was ' Kirk & Baum.' The names of the partners composing the firm is a different thing. At the time. of the levy and sale by the sheriff, and up to this time, the judgment stands in name of Kirk & Baum, by James S. Kirk and John E. Baum, doing business under that name, and the fact that the other partners have made no effort to have the judgment restricted to the partners confessing it, is evidence of acquiescence by them. They have not questioned the plaintiffs' title to the personal property.

" Again, it is contended that the defendants are estopped from questioning the validity of the sale or the title of the plaintiffs under it. Before the sale the landlords gave notice of rent in arrear to the sheriff, and after the sale received the amount they were entitled to by law out of the proceeds. The rule of law is, that one who accepts a part of the purchase-money arising out of a sheriff's sale, is estopped from denying the validity of the sale. Henry C. Carey was one of the landlords. El. Hart and Griffith T. Jones either hold under the landlords, or are strangers, and in no better condition.

" Upon the whole case we think the plaintiffs are entitled to recover. The question of damages is a question of fact for you. The ordinary rule is the value of the property at the time of the conversion, with interest to date of trial, although the jury are justifiable in going further when there has been an outrage in the taking, or vexation and oppression in the detention as a compensation to the party injured."

The verdict was for the plaintiffs for $12,000.

The defendants took a writ of error, and assigned 41 errors. 12 specifications related to the decisions of the court on questions of

[Carey v. Bright.]

evidence, 20 to the refusal of the court to affirm their points, and the remainder to the charge.

*F. W. Hughes* and *H. M. Phillips* (with whom was *E. O. Parry*), for plaintiffs in error.—As to the interest of Kirk. The property purchased by the plaintiffs was in trust for the creditors of Kirk named in the confession: Campbell *v.* McLain, 1 P. F. Smith 200; Campbell *v.* Penna. Ins. Co., 2 Wh. 64; Chorpenning's Appeal, 8 Casey 315; Leisenring *v.* Black, 5 Watts 304; Wolf *v.* Eichelberger, 2 Penna. R. 346; Twelves *v.* Williams, 3 Wh. 485; Wilkinson *v.* Pitts. F. & M. Turnpike, 6 Barr 398; Buchanan *v.* Buchanan, 10 Wright 186; Patterson *v.* Reed, 7 W. & S. 144.

As to evidence to prove the meaning of " collieries :" 2 Stark. Ev. 565; Snowden *v.* Warder, 3 Rawle 101; Beatty *v.* Roberts, 2 Penna. R. 65; Swink *v.* Wilson, 3 B. & Ad. 728; Clayton *v.* Gregson, 5 Ad. & E. 302; Astor *v.* Union Ins. Co., 7 Cowen 203; Coit *v.* Ins. Co., 7 Johns. 385; Eaton *v.* Smith, 20 Pick. 150; Lushington *v.* Sewell, 1 Sim. 435; Stewart *v.* Garnett, 3 Id. 308; Taylor *v.* Briggs, 5 B. & C. 525; 2 Phillips on Ev. 709; Farrar *v.* Stackpoole, 6 Greenl. R. 157.

A general assignee for creditors is not in the position of a purchaser: Twelves *v.* Williams, *supra;* Vandyke *v.* Christ, 7 W. & S. 374. Where the owner allows another to treat goods as his own to the injury of others, he is estopped: Gregg *v.* Wells, 10 Ad. & E. 90; Pickard *v.* Sears, 6 Id. 469.

As to the evidence that the property was not in the sight or control of the sheriff: Wood *v.* Vanarsdale, 3 Rawle 401; Lowry *v.* Coulter, 9 Barr 349; Schuylkill County's Appeal, 6 Casey 358; Duncan's Appeal, 1 Wright 500.

Under an execution at the suit of a creditor of one partner the contingent interest of the partner can be sold: Deal *v.* Bogue, 8 Harris 228; Reinheimer *v.* Hemingway, 11 Casey 432; 3 Steph. N. P. 2701.

There was no sufficient evidence of conversion: Pothouser *v.* Hodgson, 1 Holt's N. P. 383; Alexander *v.* Southey, 5 B. & Ald. 247; Berry *v.* Vantries, 12 S. & R. 89; Mires *v.* Solebay, 2 Mod. 242; 3 Steph. N. P. 2686.

As to estoppel by receipt of rent: Co. Litt. 352 b; Smith's L. Cas., Hare & Wallace's Notes 643.

The general effect of the charge was calculated to mislead: Reeves *v.* Delaware, L. & W. Railroad, 6 Casey 454.

There were questions of fact for the jury: Strohl *v.* Levan, 3 Wright 177.

*W. H. Rawle* and *J. Bannan* (with whom was *J. W. Ryan*), for defendants in error.—The confession of judgment by Kirk

[Carey *v.* Bright.]

and Baum was binding on the other partners: Taylor *v.* Henderson, 17 S. & R. 456; Harper *v.* Fox, 7 W. & S. 143; Grier *v.* Hood, 1 Casey 430.

The actual seizure of part of the property in the name of the whole was a sufficient levy: Wood *v.* Vanarsdale, Lowry *v.* Coulter, Schuylkill County Appeal, Duncan's Appeal, *supra;* Wilson's Appeal, 1 Harris 427; Lewis *v.* Smith, 2 S. & R. 142.

It is not a badge of fraud to leave goods in the hands of a debtor after a sheriff's sale: Note to Twyne's Case, 1 Sm. L. C. 70.

As to the conversion: Featherstonhaugh *v.* Johnston, 8 Taunt. 237; Baldwin *v.* Cole, 6 Mod. 212; McCombie *p.* Davies, 8 East 540; Hunt *v.* Greenwich, 3 Stark. 306.

If the court were right in directing the verdict the judgment will not be reversed, although the reasons were wrong: Malson *v.* Fry, 1 Watts 433; Edgar *v.* Boies, 11 S. & R. 450; Lobb *v.* Lobb, 2 Casey 237; Lacey *v.* Arnett, 9 Id. 169; Johns *v.* Batton, 6 Id. 84; Burkholder *v.* Lapp, 7 Id. 322; Waltham *v.* Spangler, Id. 523; Tams *v.* Bullitt, 11 Id. 308.

The opinion of the court was delivered, February 6th 1868, by

SHARSWOOD, J.—It is clear that James S. Kirk was an interested witness, and incompetent to testify on behalf of the plaintiffs below. They had been the plaintiffs in a judgment confessed by the witness and his partner Baum to them in trust for certain of their creditors. By a sheriff's sale under an execution issued on this judgment they had become the purchasers of the personal property which was the subject-matter of this action of trover. Of course they could only hold it as trustees, and the witness Kirk had a direct interest in the property as a fund or means of paying his debts. His release could only reach his right to the surplus after the object of the trust had been accomplished, and left him still as directly interested as before in increasing or preserving the fund so as to discharge by means of it his personal liability to his creditors. The case of Wilkinson *v.* The Pittsburg Farmers' and Mechanics' Turnpike Company, 6 Barr 398, is an authority in point if one were needed. The determination of this question sustains the 1st and 3d assignments of errors, and renders unnecessary the consideration of the 2d, 4th, 5th, 6th and 12th, all which relate to evidence proposed and allowed by the court below to be given by this incompetent witness.

The 7th error assigned is in the admission of a notice by Mr. Parry, who was the attorney of the defendants below, addressed to the sheriff, claiming rent by them out of the proceeds of the sale. One of the questions in the cause was whether the subject-matter of the action, or some part of it, had been included in the levy, and passed to the plaintiffs below, and as the defendants

[Carey v. Bright.]

rested their claim upon a subsequent purchase from the defendants in the execution, it was certainly material to show that they had notice of the sale. The objection seems to have been rested principally upon its being out of time, as the defendants' case had not then been opened. But we do not reverse on account of errors or irregularities in the mere order of giving testimony. The plaintiff may, if he pleases, with the court's permission, anticipate the defendant's case and defeat it. The court in their discretion will regulate the order in which the evidence shall be given. But for a court of error to enter minutely into matters of that kind would be to intrude unnecessarily on the right of the court below, and to embarrass the administration of justice, instead of assisting it: Salmon v. Rance, 3 S. & R. 311; Harden v. Hays, 2 Harris 91.

The 8th error assigned is because the court rejected the evidence contained in the offer of the defendants below to inquire of the sheriff, who was under examination as a witness for them, whether he was ever down the slope or shaft of St. Clair Collieries, to be followed with evidence that a large part of the property included in the levy and sale was in the mines, and that the defendants below had purchased such part subsequently to the sale. That it is essential to constitute a good levy under an execution that the personal property levied on should be in the power, or at least in the view, of the officer at the time it was made has often been held in this court, for which it will be sufficient to refer to Duncan's Appeal, 1 Wright 500. It is in truth a relaxation of the rules of the English common law, which required actual and exclusive possession to be taken by him. The defendants below had then a right to ask this question, and that though the witness had before said that he had no recollection of having made the levy, which seems to have been the reason it was overruled, for they might afterwards be able to prove *aliunde* that he was mistaken—and in point of fact the deputy did afterwards testify that he was. Though he may have forgotten that part, he might well be able to say that he had never been down the shaft. This assignment of error is therefore sustained.

The 9th error assigned is in the rejection by the court of an offer by the defendants below to show by their agent the condition of the mines when he took charge of them—that they were in an unworkable and dilapidated state, and would cost many thousand dollars to repair. This was entirely irrelevant to any question in the cause. The value of the personal property in the mines, which was the subject in controversy, had nothing whatever to do with the value or condition of the mines themselves. The court below was therefore perfectly right in rejecting it.

The 10th error assigned is that the court erred in rejecting

8 P. F. Smith—6

[Carey *v.* Bright.]

evidence offered to be given by persons concerned in the working
and sale of collieries, that the term colliery embraces all the
movable property at the mines used or placed there to be used in
the working of them, and that it has been so understood for
twenty-five years by all engaged in mining in Schuylkill county.
The words of the agreement under which the defendants below
claimed the personal property were, "that Kirk & Baum and
Baum, Ogle & Co. sell and assign all their interest in the Shaft
and Slope *Collieries* to Henry C. Carey, Abraham Hart and Eliza
C. Baird, the lessors in the lease." If this evidence was admis-
sible, it was certainly very relevant and important. Whatever
objections may exist in general to evidence of particular customs
or usages, it seems to be within the scope of all the cases, both
in this state and elsewhere, to show by the testimony of persons
engaged in any particular trade or business what is the meaning
which belongs to a term or name given to any particular class of
objects or property in such trade or business, when that term or
name is used in a contract, whether written or verbal. Though
the construction of written instruments is exclusively with the
court, yet they cannot and are not expected to understand the
meaning of all terms used in art, science or commerce. Experts
then may be called in, and the question upon their testimony
must necessarily be referred to the jury. Mr. Starkie has stated
the rule with great precision: "Where terms are used which are
known and understood by a particular class of persons, in a certain
special and peculiar sense, evidence to that effect is admissible for
the purpose of applying the instrument to its proper subject-
matter; and the case seems to fall within the same consideration
as if the parties in framing their contract had made use of a
foreign language, which courts are not bound to understand:"
Starkie on Evidence 701, 8th Am. ed. This doctrine has been
recognised and admitted by this court in several cases. In Gor-
don *v.* Little, 8 S. & R. 533, it was decided that evidence of
usage, fixing the construction of the words "inevitable dangers
of the river" in a bill of lading for the transportation of goods
by inland navigation, is admissible, and under many important
qualifications and restrictions, which it is unnecessary to state
here, the principle has been admitted in Rapp *v.* Palmer, 3 Watts
178; Snowden *v.* Warder, 3 Rawle 101; Gilpin *v.* Howell, 5
Barr 41. We think, therefore, that this assignment of error is
sustained.

The 11th error assigned, is in rejecting evidence offered of the
valuation of the Shaft and Slope Collieries in reference to their
capabilities and value, and that the price mentioned in the agreement
of December 16th 1861, was a full price for the lease, fixtures and
all the movable property at the collieries. We think the court
below were right in rejecting this evidence. The agreement re-

ferred to, was for the surrender of the collieries by the lessees to the lessors. So many considerations may have entered into the contract for getting rid of the tenants and regaining possession by the landlords to induce them to pay a high price for the surrender, that no inference could legitimately be drawn from it, as to whether the movable property on the ground, or in the mines, was intended to pass. Its only tendency would have been to mislead the jury.

These assignments of error comprise all the exceptions to the rulings of the court below on questions of evidence. Twenty points were presented, and there are twenty assignments of error on the answers to them. There are also nine additional exceptions and errors assigned to the charge. It will not be necessary to examine each of these assignments separately. Many of them relate to the same question, and it will sufficiently indicate our views in regard to each to consider the main points upon which the case went to the jury.

The principal question was, whether there was any evidence of a conversion by the defendant below, either by a tortious taking or a refusal on demand to deliver the property. The demand was made by Sedgwick, one of the plaintiffs below, upon Jones, one of the defendants, to whom, as the foreman of El. Hart & Co., Mr. Carey, another of the defendants, had delivered possession. When the demand was made on Jones, his answer was that he had received orders from Mr. Hart not to let anything be moved. It is true that an agent having received the possession of a chattel for his principal, is not bound to deliver it to the true owner; and a refusal by him, thus explained, would be no evidence of conversion. But then, as was held in Berry *v.* Vantries, 12 S. & R. 89, if this is the explanation of his refusal, it is incumbent on him to prove it. His declaration at the time that he was acting by the orders of somebody else, amounts to nothing. That may have been a mere trick to evade the demand, and if permitted to avail, might be resorted to by every defendant in trover. As to Jones, therefore, there was evidence of conversion. In regard to the other defendants the case cannot be rested on this ground. But there was evidence—in fact it was the defendants' own case as attempted to be established by them—that they had purchased the goods from the defendants in the execution after the sale by the sheriff, of which there was evidence that they had notice. We must assume therefore, for the purposes of this question, that the defendants in the execution, whose title had prima facie at least been divested, had no right to dispose of them. If so, it is well settled that such a purchase by the defendants below, was itself a conversion: McCombie *v.* Davies, 6 East 538. "Certainly," said Lord Ellenborough, "a man is guilty of a conversion, who takes my property by assignment from another, who has no authority to dispose of it; for what is that but assisting that

[Carey *v.* Bright.]

other in carrying his wrongful act into effect?" Hunt *v.* Gwennap, 2 Starkie 306; Bristol *v.* Burt, 7 Johns. 254. We think, therefore, there was evidence for the jury of conversion as against all the defendants.

The next question presented was, whether there was any evidence of title in the plaintiffs below. We think the learned judge was right in instructing the jury that when a partnership is carried on by two different firm names, a judgment against either firm will support an execution against the partnership effects, and the sale under it will pass the title of all the partners. If Ogle, Gross and Clark were dormant partners of the firm of Kirk & Baum, the non-joinder of them as defendants in the suit against the ostensible partners, could not even have been successfully pleaded in abatement: Alexander *v.* McGinn, 3 Watts 220; Gow on Partn. 216; Collier, sect. 719. Much less can it be pretended that upon a judgment against ostensible partners in the firm name, the interest of the partners not named, will not pass to the sheriff's vendee: Taylor *v.* Henderson, 17 S. & R. 453; Harper *v.* Fox, 7 W. & S. 142; Grier *v.* Hood, 1 Casey 430.

As to the question of the sufficiency of the levy, the court refused to affirm the points of the defendants below, and instructed the jury that the receipt by them of the sheriff of rent out of the proceeds estopped them from denying that the title had passed under it. It is unnecessary to decide the broad question whether a landlord-receiving rent out of the proceeds of goods on the demised premises levied on and sold under an execution against the tenant is estopped from denying the title of the sheriff's vendee. In this case the question was only whether as to part of the goods alleged to have been sold, there ever had been a legal levy. A mere paper levy is no levy at all, and a sale under it is a nullity as to subsequent execution-creditors and purchasers: Lowry *v.* Coulter, 9 Barr 349. A man might have his bed sold from under him, by that means, without his knowing it. There was here a considerable amount of personal property levied on, but the sheriff added to the inventory "all other personal property in, about and connected with said colliery," and without having ever gone down into the mines or seen the property, he sold under that description, and left the whole in the possession of the defendants in the execution, from whom the landlord afterwards purchased it. The proceeds of all the goods amounted to $3605.25—what was sold under the general designation $21. The landlords received $184.47, out of the entire proceeds for rent. That part of the goods which was duly levied on and sold was ample for the rent. They must be presumed to have received it out of that. The principle of estoppel was inapplicable to such a case, and we are of opinion, therefore, that the court erred in their charge to the jury on this point.

[Carey v. Bright.]

It is hardly necessary to say that the 7th point, which requested the court to take the entire case from the jury, was properly declined: and so was the 16th point, that if the jury believe that the sheriff's sale was intended to hinder, delay or defraud Henry C. Carey, one of the landlords, and a creditor of Kirk & Baum, then the sale is null and void against the said Henry C. Carey, and the plaintiffs cannot recover: for Mr. Carey, claiming by assignment from one of the parties to the alleged fraud, if any existed, was in no position to make such an objection: McGee v. Campbell, 7 Watts 545. Neither was there any error in declining to affirm the 17th point, that the sale by Kirk, Baum, Ogle, Clark & Gross to the defendants below of all their interest in the shaft and slope collieries "included all the movable property belonging to and used at these places in the mining of coal, and that the word colliery is a collective compound including many things, and is not limited to the lease and fixtures of a tunnel, drift, shaft, slope or vein from which the coal is mined." According to the most approved lexicographers, to whose works courts must resort for the meaning of words which have no settled legal construction, a colliery is "a place where coals are dug:" Johnson, Webster, ad verbum. No question appears to have been raised as to whether the articles in dispute were or were not fixtures. It is probable that many things about a colliery, though not actually affixed to the freehold, may come within that category, like the rolls of an iron-mill, or the machinery of a manufactory, whether fast or loose, which is necessary to constitute it, and without which it would not be a mill or manufactory at all: Voorhis v. Freeman, 2 W. & S. 116. But the mere loose movables about such an establishment, in the absence of any usage or general understanding, would no more pass than would the tools of a mechanic by the sale of his shop.

We are of opinion that the 39th assignment of error is sustained, and that the court erred in saying to the jury, "Upon the whole case we think the plaintiffs are entitled to recover." There were questions of fact to be passed upon by the jury before this result could be aimed at. And while the court were right in the abstract in their charge upon the measure of damages, yet, when they added that "the jury are justifiable in going further when there has been an outrage in the taking, or vexation or oppression in the detention, as a compensation to the party injured," they ought to have accompanied this remark with an instruction that there was nothing in the case, as there certainly was not, to justify them in applying any other than the ordinary rule.

We believe that we have thus reviewed all the exceptions taken and points made in the court below, and upon the whole are of opinion that there has been manifest error.

Judgment reversed, and venire facias de novo awarded.