# R. MARTINEZ ET AL. v. A. EARNSHAW.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
NO. 3 OF PHILADELPHIA COUNTY.

Argued April 7, 1891—Decided October 5, 1891.
[To be reported.]

(a) Plaintiffs sold to defendant "dry iron ore of usual quality" at a certain price per ton, "guaranteed to contain a yield of fifty per cent of iron in the natural state, with a sliding scale" at a certain rate for every unit over fifty per cent, and a deduction at a certain rate for every unit

under fifty per cent, final settlements on output weights and assays at port of discharge.

(b) To a statement of claim for damages for the defendant's refusal to accept the full quantity of ore sold, the defendant filed an affidavit of defenᶜe averring that a portion delivered did not contain fifty per cent of iron in the natural state, and that as soon as he discovered this he refused to receive any more ore under the contract:

1. Prima facie the contract imported a guaranty demanding literal performance. That a sliding scale was provided for an allowance for an excess of iron, and a diminution for a deficiency, was not controlling. Apparently, the latter created but an option, which did not mitigate the strictness of compliance upon which the purchaser might insist.

2. Though a trade custom, or other relevant facts might affect the determination of the defendant's right to strict performance under the contract, yet a literal breach thereof by the plaintiffs being averred by the defendant, that averment was sufficient to prevent a summary judgment for the plaintiffs without a hearing.

Before PAXSON, C. J., GREEN, CLARK, McCOLLUM and MITCHELL, JJ.

No. 203 January Term 1891, Sup. Ct.; court below, No. 416 June Term 1890, C. P. No. 3.

To the number and term of the court below, Ramon Martinez and others, trading as R. Martinex e hijos y Conesa, brought assumpsit against Alfred Earnshaw, filing a statement of claim, verified by affidavit, as follows:

"The plaintiffs seek to recover of the defendant the sum of $3,750, with interest thereon from the first day of January, 1888, for damages suffered by the plaintiffs for breach, on the part of the defendant, of a certain contract entered into by and between the said plaintiffs and defendant, by his agents Allan, Wrenn & Co., which contract is in the following words and figures:

"'Contract made this 28th of March, 1887, between Messrs. R. Martinez e hijos y Conesa, of Cartagena, and Messrs. Allan, Wrenn & Co., of London, acting on behalf and for account of Alfred Earnshaw, Esquire, of Philadelphia, U. S. A.

"'1. That R. Martinez e hijos y Conesa sell, and Alfred Earnshaw purchases, all the dry iron ore of usual quality which sellers can collect from the mine San Anisetto during the rest of this year, up to ten thousand tons or thereabouts, at the price of six shillings per ton of twenty-two hundred and forty pounds,

f. o. b. Cartagena, guaranteed to contain a yield of fifty per cent of iron in the natural state, with a sliding scale at the rate of three pence per unit additional for every unit over fifty per cent, and with a deduction at the rate of four pence per unit for every unit under fifty per cent. Final settlements to be made on output weights and assays found at port of discharge.

" ' 2. R. Martinez e hijos y Conesa will advise Messrs. Allan, Wrenn & Co., from time to time, about the quantity of mineral they have ready for shipment under this contract, and Messrs. Wrenn &. Co. will do the chartering of tonnage required according to these advices. .

" ' 3. R. Martinez e hijos y Conesa undertake to put the mineral on board steamers at the rate of two hundred and fifty tons per day, weather permitting, Sundays and holidays excepted, being paid for so doing five pence per ton. Any dispatch-money earned in loading steamers at Cartagena to be equally divided between buyers and sellers. Sellers are to pay demurrage incurred at port of loading in the event of not so doing.

" ' 4. Alfred Earnshaw has the right of sending sailing vessels to load under this contract, he paying R. Martinez e hijos y Conesa five pence per ton additional price; all other conditions as stated herein, except that the loading will be at the rate of eighty tons per day.

" ' 5. On arrival at port of discharge of the cargoes shipped under this contract, same shall be sampled and assayed by a chemist of repute, cost being paid jointly by buyers and sellers, and whose decision shall be final and binding on both parties.

" ' 6. Payment by seller's draft on an approved London banker at sixty days for steamer cargoes, and ninety days for sailing-ship cargoes, for eighty per cent of the amount of provisional invoice, based on fifty per cent of iron, against bill of lading and consular invoice (if required), and the balance to be sent within fifteen days after output, weight, and assays are ascertained in cash. In the event of loss of any cargo, the full amount of provisional invoice shall be paid by buyers.

" ' 7. In the event of war, civil commotion, cholera, quarantines, or any other case of force majeure, which may hinder the

loading or chartering of tonnage in execution of this contract, same shall be suspended during the existence of the producing cause.'                                [Signed in duplicate.]

" And the said plaintiffs aver that they did mine the said ten thousand tons of said ore capable of yielding about fifty per cent of iron in the natural state, from the said mine, in accordance with the agreement, and notified the said Allan, Wrenn & Co., as well as the said defendant, from time to time, of the quantity of the said ore which they, the said plaintiffs, had ready for shipment, and did perform all and everything that they, the plaintiffs, ought to have performed according to the terms of the said agreement, and that nothing has occurred or has been done which has had the effect to release the said defendant from the terms of the said contract; but that the said defendant, disregarding his promises in his said agreement contained, neglected and refused to charter the tonnage required by the said agreement and advices, and has refused to provide means for the shipment of said ore, or any part thereof, and still doth neglect and refuse so to do; and hath hitherto neglected and refused and still doth neglect and refuse to pay for the same, or any part thereof, or to fulfil any part of the said agreement on his part to be fulfilled; and, by reason of the premises, the said plaintiffs have suffered the said loss of $3,750; as, at the expiration of the said contract, namely, the thirty-first day of December, 1887, and for some considerable time thereafter, the highest and best price that could be obtained for the said ore was four shillings and six pence per ton, the market price of the said ore having declined to that sum.

" The loss thus entailed upon the said plaintiffs of about $3,750, was the difference between the contract price of the said ore, in accordance with the said agreement, and the market price of the said ore at the time of the expiration of the said agreement.

" The plaintiff therefore brings this suit."

The defendant filed an affidavit of defence averring:

" Before the making of the contract, a copy of which is set forth in the plaintiffs' statement, the defendant, when negotiating with the plaintiffs for dealing in the ore which is the subject of the contract, examined the mines, and received from the defendants certain representations as to the qualities of the

ore which led him to request samples should be sent, with a view of purchasing. A sample was forwarded and analyzed, showing the ore contained 59.586 of metallic iron and .025 of phosphorus, after drying the ore at two hundred and twelve degrees. A second sample was sent him by the plaintiffs, accompanied with a letter of August 31, 1886, a copy of which is annexed. This sample showed 53.598 of metallic iron and .026 of phosphorus, after drying the ore at one hundred and twelve degrees.

" Having received this letter and the samples, and having procured the analysis thereof, the defendant authorized shipments to be made, and two were made, one by the steamship Lorain and one by the bark Simpatia. Before the arrival of these vessels, relying on the samples and letter, the defendant authorized a contract to be made for future shipments, and the contract set out in the statement was made. After this, the vessels arrived and their cargoes were delivered and sent to the furnaces. These ores were then tested and ascertained not to accord with the samples or the guaranty in the contract, the analysis showing that the cargo of the Lorain contained 48.747 of metallic iron in the natural state and .038 of phosphorus, and the cargo of the Simpatia contained 49.40 of metallic iron in the natural state and .030 of phosphorus.

" The defendant did not discover these facts until after the iron had been delivered at the furnaces and it had become impracticable to reject and return the ores, nor could he, in the usual course of business of this kind, have discovered the fact sooner. Immediately on ascertaining the fact that the ores shipped did not correspond to the quality guaranteed, the defendant repudiated the contract that had been made and refused to receive any more ore under it.

" As respects the averment that the plaintiffs have fulfilled their part of the contract, and were ready and willing to perform the same by loading ore of the kind stipulated for by the contract, the defendant believes this is not true, and expects to be able on the trial to prove that the ore that was sold by the plaintiffs, and for the loss on which he claims to recover, was not of the quality that the defendant was bound to accept if the contract had continued to be in force." . . . .

After argument of a rule, judgment was entered for the

plaintiffs for want of a sufficient affidavit of defence, the court below filing no opinion. Thereupon, the defendant took this appeal, assigning the order entering judgment for error.

*Mr. R. C. McMurtrie*, for the appellant:

The contract says, in express words, that the sellers undertake to mine and deliver ore guaranteed to contain a yield of fifty per cent of iron in the natural state. Natural state means, as it comes to the purchaser and before roasting or drying for the purpose of analysis. Then follows the sliding scale. This is explained as intending to provide the terms of settlement, in case the ore is accepted and the right to reject it for non-conformity to the standard is not discovered until it is too late to reject it: Simond v. Bradden, 2 C. B., N. S., 336. If there was a warranty, was the defendant bound to accept the ore when it was not of the standard? The defendant is not in court on the effect of a delivery and acceptance, but on the obligation to accept a thing that differs from the thing bought; and he was not bound to accept: Benj. on Sales, § 894; Depuy v. Arnold, 1 W. N. 157; Isaacs v. Maris, 1 W. N. 268.

*Mr. Isaac S. Sharp* (with him *Mr. S. H. Alleman*), for the appellees:

1. A contract must be "read in the light which the business to which it relates, with all the incidents and usages of that business as conducted at the time, may throw upon it:" Dexter v. Lathrop, 136 Pa. 565. There is no absolute warranty that the ore shall contain fifty per cent of iron, or provision that if it do not the purchaser may reject it. The contract was the work of the parties themselves, and the strict and technical meaning of the words should not be adopted. Can a man not warrant an article, and yet stipulate that after he shall have delivered it to the purchaser the latter shall not be at liberty to return it, but if it does not answer the guaranty or warranty the damages of the purchaser shall be limited to a certain sum, or measured by a certain scale? Such a stipulation would not render the guaranty senseless, and it is not prohibited by statute or by the policy of the law: Heyworth v. Hutchinson, L. R. 2 Q. B. 447; Benj. on Sales, Bennett's ed., 565; Richardson v. Brown, 1 Bing. 344.

2. All warranties, however expressed, are open to such construction, from surrounding circumstances and the established usage in similar cases, as will make the engagement of warranty conform to the intention and understanding of the parties: 1 Pars. on Cont., 5th ed., 576; Benj. on Sales, Bennett's ed., 522; Vernede v. Weber, 1 H. & N. 311. And this was not a sale by sample: Benj. on Sales, Bennett's ed., 586, 625, 626. But, in any event, a sale by sample, under our common law, requires only a delivery of goods of the same description, not of the same quality. And the law of the place of the contract, in the absence of proof to the contrary, is presumed to be the same as the common law of the forum: 21 Am. Law Reg. 572; Boughton v. Bank, 9 W. N. 519; Pfaelzer v. Drexel, 11 W. N. 480.

OPINION, MR. JUSTICE GREEN:

In this case judgment was entered against the defendant for want of a sufficient affidavit of defence. The facts set forth in the affidavit are, to be taken as verity, and we have nothing before us but the plaintiffs' statement and the defendant's affidavit. The statement contains the contract upon which the action is founded. By the explicit terms of the contract, the plaintiffs sold and the defendant bought " dry iron ore," of usual quality, " guaranteed to contain fifty per cent of iron in the natural state, with a sliding scale at the rate of three pence per unit additional for every unit over fifty per cent, and with a deduction at the rate of four pence per unit for every unit under fifty per cent." The affidavit alleges that the first deliveries under the contract contained, one of them, 48.747 of metallic iron in the natural state and .038 of phosphorus, and the other contained 49.40 of metallic iron in the natural state and .030 of phosphorus, and that as soon as this was discovered the defendant repudiated the contract and refused to receive any more ore under it. As to all other matters contained either in the statement or affidavit, some of which involve considerations of fact and may possibly on a trial control the result, we can have nothing to say, and of course cannot determine either positively or inferentially.

As the affidavit contains a positive averment that the ore delivered did not contain fifty per cent of metallic iron in its

natural state, a breach of the guaranty is asserted. This breach may or may not be vital to the plaintiffs' right of recovery. Possibly the variation from the percentage of metallic iron required by the contract, may be so slight as that the ore delivered may be a substantial compliance with the contract, or a compliance which the law, when better informed by testimony, may regard as adequate. But we cannot know that now, and we can only deal with the breach of a condition which the purchaser required by the terms of his obligation. Technically, guaranties demand literal performance. Such is the prima facies of the engagement. It is not for courts to know, as matter of law, whether there are or may be considerations extrinsic the written stipulations of the parties which may excuse a literal compliance with them. It is enough for present purposes to say that we do not find any matter in the contract itself which necessarily has that effect. The suggestion that a sliding scale is provided, for an allowance for an excess of iron and a diminution for a deficiency, is not controlling. Apparently that provision creates nothing more than an option, but does not mitigate the rigidness upon which the purchaser may insist if he chooses. Possibly a trade custom or other legitimate facts may affect the determination of the purchaser's strict right. But we cannot either hear or decide them now. We know at this time only that a literal breach by the plaintiffs is alleged and claimed, and a literal breach is enough to defeat a compulsory judgment without a hearing. It seems to us that, if the defendant proves the facts set out in his affidavit, the burden will be cast upon the plaintiffs to relieve themselves from the imputation of a breach, and that consideration is enough to carry the case to a jury.

Judgment reversed and procedendo awarded.

On January 4, 1892, a motion for a re-argument was refused.