# Ramon Martinez Guillon et al., Appellants, v. Alfred Earnshaw.

169    463
19 SC ³612
169    463
29 SC ²469

169    463
223    ²376

169    463
39SO³104

*Contract—Custom—Evidence.*

Where terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible, for the purpose of applying the instrument to its proper separate matter.

Defendant agreed in writing to purchase from plaintiffs all the dry iron ore of usual quality which plaintiffs can collect from the San Anisetto mine during the rest of the year, up to ten thousand tons or thereabouts, at the price of six shillings per ton of 2240 lbs., f. o. b. Cartagena, guaranteed to contain a yield of fifty per cent of iron in the natural state, with a sliding scale at the rate of three pence per unit additional for every unit over fifty per cent, and with a deduction of four pence per unit for every unit under fifty per cent. Plaintiff offered to prove that it was the custom at Cartagena to fix a standard of fifty per cent with a sliding scale to regulate the price according to the result of the assay of the cargo when discharged; that when a sliding scale was thus fixed for the rise or fall of the price of iron ore, the purchaser was obliged to receive the mineral, provided it did not go below forty-five per cent or forty-six per cent. Defendant claimed that the ore showed only forty-eight and forty-nine per cent of iron. *Held,* that the testimony as to the custom of the trade at Cartagena was admissible.

*Contract—Measure of damages.*

Where a vendor stands in the attitude of complete performance on his part, and the vendee refuses to receive the goods, the vendor may sell the goods for the market price at the place of delivery, but in making the sale he is bound to exercise reasonable and intelligent judgment in ascertaining the market price at that point.

In such a case it is immaterial that the vendor mixes with the goods an inferior grade of goods to further the sale of the whole. If such mixture results in a less price than the market price for the goods sold to the vendee, the vendor must account for the market price of the goods originally sold.

Argued March 29, 1895.    Appeal, No. 9, Jan. T., 1895, by plaintiffs, from order of C. P. No. 3, Phila. Co., June T., 1890, No. 416, refusing to set aside nonsuit.    Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL, and DEAN, JJ.    Reversed.

Assumpsit to recover damages for breach of contract.
The facts appear by the opinion of the Supreme Court.

Depositions of several witnesses taken in Cartagena, Spain, were offered in evidence, to prove the trade custom referred to in the opinion of the Supreme Court. This evidence was objected to by defendant, and excluded by the court. [1-8]

The court entered a compulsory nonsuit which it subsequently refused to take off. Plaintiffs appealed.

*Errors assigned* were (1-8) rulings on evidence, quoting the bill of exceptions ; (9) refusal to take off nonsuit.

*Alex. Simpson, Jr., Isaac S. Sharp* with him, for appellants. —The evidence of custom was admissible : Benjamin on Sales (Bennett's ed.), 565 ; 1 Parsons on Contracts, 5th ed. p. 576 ; Heyworth v. Hutchinson, L. R. 2 Q. B. 447 ; Myers v. Sarl, 3 L. R. (Q. B.) 15 ; Clarke's Browne on Usages & Customs, sec. 85 ; Lawson on Usages and Customs, 167 ; Stultz v. Dickey, 5 Binn. 287 ; McMasters v. Penn. R. R., 69 Pa. 374 ; Citizens' Ins. Co. v. McLaughlin, 53 Pa. 485 ; Brown v. R. R., 83 Pa. 316 ; Forepaugh v. R. R., 128 Pa. 219 ; Baum v. Birchall, 150 Pa. 164 ; Waverly Bank v. Hall, 150 Pa. 466 ; Scott v. Wells, 6 W. & S. 357 ; Winslow v. Leonard, 24 Pa. 14 ; Andrews v. Weaver, 4 Mont. Co. 110 ; Macomber v. Parker, 13 Pick. 175 ; 3 Benjamin on Sales, sec. 357.

Where the vendor stands in the attitude of complete performance on his part, he is entitled to the contract price as his measure of damage ; but on an executory contract for the sale of goods not specific, the measure of damages for a refusal to receive them, is the difference between the contract price and the market price on the day appointed for delivery : Unexcelled Fire Works Co. v. Polites, 130 Pa. 537 ; 3 Benjamin on Sales, sec. 1011.

*George Tucker Bispham*, for appellee.—The contract was a warranty, and the purchaser could reject if he pleased. It gave him, however, an option to take at a reduction for the inferiority in quality : Co. Lit. sec. 697 ; Depuy v. Arnold, 1 W. N. C. 157 ; Isaacs v. Maris, 1 W. N. C. 268 ; Martinez v. Earnshaw, 143 Pa. 479 ; Simond v. Bradden, 2 C. B. N. S. 336.

The custom was not admissible : Blackitt v. Royal Exchange Assurance Co., 2 C. & J. 249 ; Browne on Usages, sec. 105 ;

Barnard v. Kellogg, 10 Wall. 383; Cox v. Heisley, 19 Pa. 243; Wetherill v. Neilson, 20 Pa. 448; Stoddard v. Emery, 128 Pa. 486.

The plaintiffs endeavored to prove the amount of loss which they had sustained. To do this they put in evidence the price brought by the ore when sold in Germany. It appeared that the ore had been shipped from Cartagena to Germany after having been mixed with ore of inferior quality, and the whole sold en masse. The price of the mass thus constituted was claimed to be the proper test by which to measure the difference between the contract price and the market price, and thus fix the measure of damages. It is perfectly plain that the sellers, by their conduct in mixing inferior ore with that which was the subject of the bargain, effectually disqualified themselves from getting a price for the mixture which would enable them to fix any standard by which the measure of damage was to be ascertained.

OPINION BY MR. JUSTICE DEAN, July 18, 1895:

The plaintiffs sued to recover the sum of $3,750, with interest from Jan. 1, 1888, damages which they claimed to have suffered, by reason of defendant's breach of a written contract for sale by them to him of iron ore.

The plaintiffs are dealers in and shippers of ore in Cartagena, Spain; the defendant is a resident of Philadelphia, and in this particular transaction acted by his agents, Allan, Wrenn & Company, of London. Through these agents, on March 28, 1887, the contract sued on was made. It stipulates: 1. That defendant will purchase all the dry iron ore of usual quality which plaintiffs can collect from the San Anisetto mine during the rest of the year, up to ten thousand tons or thereabouts, at the price of six shillings per ton of 2240 lbs., f. o. b. Cartagena, guaranteed to contain a yield of fifty per cent of iron in the natural state, with a sliding scale at the rate of three pence per unit additional for every unit over fifty per cent, and with a deduction of four pence per unit for every unit under fifty per cent. Final settlement to be made on output, weights and assays found at port of discharge.

2. Plaintiffs to advise the agents of defendant from time to

time of the quantity ready for shipment, and the agents to char·ter vessels for carrying accordingly.

3. Plaintiffs engage to load at rate of two hundred and fifty tons per day, weather permitting, Sundays and holidays excepted, and to be paid five pence per ton for loading; dispatch money earned in loading to be equally divided; plaintiffs to pay demurrage charges at port of loading.

5. On arrival at port of discharge, cargo to be sampled and assayed by chemist of repute, whose decision is to be final; costs of assay to be equally divided between the parties.

The 4th, 6th and 7th stipulations are not material to this dispute.

The plaintiffs, within the time specified in the contract, had ready for shipment at Cartagena the 10,000 tons of ore, and made repeated requests on defendant to provide vessels for shipment; this he did not do, assigning as an excuse that it was impossible to obtain them; then, under date of January 16, 1888, after the year had expired, plaintiffs, stating their disappointment at nonarrival of vessels, put this pointed interrogatory to defendant's agent:—" Kindly tell us by return post, whether you are going to charter for our contract or not; we cannot wait any longer." To this, the agents reply five days afterwards, that they are doing their best to secure vessels but " If you have any outlet for the mineral, we should be perfectly willing for you to sell it." There was other evidence, showing a readiness and willingness on part of plaintiffs to perform, and failure of defendant to fulfill his part of the contract, in furnishing vessels for shipment of the ore. Defendant having refused to pay damages, plaintiffs brought suit.

In answer to the alleged breach of contract, defendant, in his affidavit, averred, that he made the contract on representations of plaintiff, as to the quality of the ore, samples of which had analyzed over 53 and 59 per cent of iron, and .025 per cent of phosphorus; further, that shipments of two cargoes had been made on the strength of these representations, but before the arrival of the vessels, and in reliance on the samples, he had entered into the contract; but afterwards, when the cargoes arrived and the ore was analyzed, it showed only 48 and 49 per cent of iron, and .038 per cent of phosphorus; that, immediately on discovering these facts, he repudiated the contract. He

therefore avers, on belief, that plaintiffs were not ready and willing to deliver the kind of ore stipulated for in the contract.

On a rule for judgment for want of a sufficient affidavit of defense, the court below made the rule absolute, and defendant appealed to this court. The case is reported in 143 Pa. 479. We reversed the judgment, for the reason, that taking the affidavit as absolute verity, that the contract had been entered into on representation of the quality of the ore, and the guaranty made to sustain the representation, the case was not one to be determined by a mere inspection of the pleadings, but should have gone to trial; and it was distinctly said in the opinion, after stating the averments of the affidavit, that we did not undertake to determine there was a breach of the guaranty which would relieve defendant from payment, and this language is used: "Possibly the variation from the percentage of metallic iron required by the contract, may be so slight as that the ore delivered may be a substantial compliance with the contract, or a compliance which the law, when better informed by testimony, may regard as adequate." The opinion, when fairly considered, only shows that on the record as it then stood we would neither give a binding interpretation of the agreement, nor attempt to adjudicate the rights of the parties; that we could only intelligently do so, after trial of the issue in the court below, on the evidence.

The case went back, and came on for trial. The plaintiffs then offered testimony by depositions to prove a custom of the iron ore trade at Cartagena, so that the court and jury might have a clear understanding of the intent of the parties by the first, or guaranty stipulation of the agreement. The nature of the testimony offered is shown by this answer of Antonio Conesa, which is responsive to an interrogatory of plaintiff:

"I was a mineral merchant. In consequence of my being in the business, I am aware of the customs of the iron ore trade in this district (Cartagena). I have had experience from the year 1884. The custom has always been to fix a standard of 50 per cent, with a sliding scale to regulate the price according to the result of the assay of the cargo when discharged. From the moment that a sliding scale is fixed for the rise or fall of the price of iron, the purchaser is obliged to receive the mineral, always provided that it does not go below 45 per cent or 46

per cent, and we have liquidation in which the mineral has resulted with 46 per cent of iron, for which we have been paid without objection." And further on, he says:—" Iron ore not being a manufactured article, it has to be taken as it comes from the mines, and the contents in the natural state vary according to the moisture which it may contain at the time of sampling. For this reason, it is impossible to give an absolute guaranty, so it is, and always has been, the custom to adopt a sliding scale."

This and much other evidence, bearing on the guaranty clause of the contract, aiding in the interpretation of its terms, which, of themselves, are capable of diverse interpretations, was offered, which, on objection by defendant, was excluded.

The court below, being of the opinion that defendant had until the last day of 1888 to accept the ore on the wharf at Cartagena, and as plaintiffs had not shown that the ore at that time was up to the standard of the guaranty, 50 per cent or over; and, at all events, as plaintiffs had, after that time, mixed the ores and sold them in Germany without notice to defendant, there could be no recovery, entered a compulsory nonsuit. From this judgment we have this appeal by plaintiffs, who assign for error the rejection of the evidence as to the trade custom, and the construction of the guaranty clause of the agreement.

There is no cast iron rule to be applied in the ascertainment of the intent of the parties as to the words used by them in the first clause of the agreement. It might be held to mean a guaranty of fifty per cent, with an option to reject, if under that analysis; but such construction, in view of the whole agreement, is an improper one. It seems to us, if believed, the evidence offered and rejected, of the custom of the trade, in what sense the words are used by sellers and purchasers of iron ore, is conclusive as to the construction to be put upon them; every word of this clause is in harmony with this trade construction.

It will be noticed, this ore was to be mined in Spain, and delivered on board at Cartagena; even eighty per cent of the invoice then became due and payable. Therefore, the place the contract was to be performed, was Spain, and the law, and the trade custom which the law recognizes, would be those of Spain, and would control the contract. As is said in Phœnix Iron Company v. Samuel, 13 W. N. C. 50: "Presumably, they understood the contract as it is understood at the place where

made, and where the vendors were to perform their part of the agreement." And Starkie on Evidence, 8th edition, 701, as to the admissibility of evidence to establish custom, lays down this rule: "Where terms are used which are known and understood by a particular class of persons, in a certain special or peculiar sense, evidence to that effect is admissible, for the purpose of applying the instrument to its proper subject-matter; and the cases seem to fall within the same consideration, as if the parties, in framing their contract, had made use of a foreign language, which courts are not bound to understand." This rule was adopted by this court in Carey v. Bright, 58 Pa. 70, where it was held that evidence of the trade meaning of the word "colliery" was admissible.

The word "guaranteed" in this contract, is manifestly used for warranted. The vendors warranted the ore to be of an average purity of fifty per cent; it was not in human power to have each and every ton in its natural state up to this standard; there cannot be an unvarying assay of a crude mineral; while this last fact appears in the rejected testimony, it is also an obvious inference from the terms of the contract. Every mineral varies as to purity with the character of its location in the natural bed; whether, when mined, it will absorb much or little moisture, depends on the character of the impurities inseparable from it, the humidity of the atmosphere, and the length of time exposed. While the variation may not be great, there will be some change incident to mining and shipment. It is a fair presumption in the absence of proof, that both parties knew this, because it is only presuming they had ordinary knowledge of the subject of the contract. Knowing this fact, that the ore would not be in the same condition when assayed at port of discharge, as when mined at the point of shipment, how did they provide that the seller should get six shillings for every ton of ore up to a fixed standard, and the buyer should not pay more than it was worth, because below the standard? By a sliding scale, which provided the vendor should pay three pence per unit when above fifty per cent, and have a deduction of four pence per unit when it fell below. The richer the ore, the less the comparative cost of smelting; the poorer, the greater, and increasing much more rapidly in cost than it lessened in purity; for that reason, the deduction, when it fell

below the standard, was greater than the increase when it rose above it; and it may be conceded, too, that even this sliding scale is to have a reasonable interpretation; ore that did not come up to the standard, was not to fall many units below it; for if it did, the ore was practically worthless for shipment; the cost of getting a ton of iron out of four tons of ore, yielding in the furnace twenty-five per cent, compared with the cost of a ton of iron out of two tons of ore, is so much greater, that evidently the parties intended the purity of the leaner ore should approach closely the standard.

Here again comes in the evidence as to the trade custom— that ore within four or five units of the standard, is alone merchantable.

In view of the evidence offered, we think the parties framed this contract to provide for the very contigency now complained of, a slight falling below the standard. And even if the ore only reached the same standard as that purchased before the contract was made, 48 and 49 per cent of iron, plaintiffs fulfilled their contract when they placed it on the ore wharf, and notified defendant it was ready for delivery f. o. b. for shipment.

Nor was it a breach of contract on part of plaintiffs, to sell the ore at the best price obtainable when defendant had not taken away a pound of it for a month after the time stipulated in the contract. Through his agents' letter of Jan. 21, 1888, to plaintiffs, he says: "If you have any outlet for the mineral, we should be perfectly willing for you to sell it." To this, on Jan. 30th, plaintiffs reply: "We beg to thank you for your suggestion to sell the ore elsewhere, but really, as we have collected this special class of ore for Mr. Earnshaw, we should like him to receive it, and if he cannot ship the ore just now, he should authorize us to draw against these stocks. . . . We think this much better than to be obliged to sell the ore elsewhere, perhaps at a great loss." But defendant neither took the ore, nor authorized plaintiffs to draw for any part of the price. Certainly, he has no right to complain that plaintiffs, months afterwards, sold it in Germany. Nor did he so complain at the trial below; his eminent counsel, Mr. McMurtrie, deceased, made this statement to the court: "I admit the plaintiffs had the quantity of ore, but not the quality of ore. I admit the plaintiffs took the ore to Germany and sold it in the way of

which we cannot complain, but the only question is, as to whether they fairly dealt with the ore, so as to make that sale a standard of price."

It will be noticed, from the contract, plaintiffs were to deliver the ore to defendant, not on the wharf, but f. o. b. on board at Cartagena, from time to time, defendant to furnish vessels on advices of quantity ready for shipment.    The breach of contract of defendant, was in the neglect to furnish the vessels to receive the ore; it was not his ore, and was not to be in his possession, until loaded.   It follows, then, it was at the risk and charge of plaintiffs, while at the wharf; as long as it was in their possession, their damages could not be the contract delivery price, unless the ore became absolutely valueless because of his failure to take it, and this last is not pretended.    Then, the plaintiffs having been ready and willing to deliver at the time appointed in the contract, of which defendant had full notice, and the ore still belonging to plaintiffs, they were bound to get the market price at the time and place appointed for delivery. It is said in Fire Works Co. v. Polites, 130 Pa. 537, adopting a well established rule, as shown by the text-books and cases there cited : " The present tendency of the American cases, is to the doctrine, that where the vendor stands in the attitude of complete performance on his part, he is entitled to the contract price as the measure of damages ; but on an executory contract, for the sale of goods not specific, the measure of damages for refusal to receive them, is the difference between the contract price and the market price on the day appointed for delivery."

The measure of damage was the actual loss, and they lost the difference between what defendant had contracted to pay for the ore, and the market price at Cartagena, when they discovered, definitely, he would not receive it.   They had a right to sell it at Cartagena, not for any price, but for the market price, to German or any other buyers.    In making the sale, they were bound to exercise reasonable and intelligent judgment in ascertaining the market price at that point.    It is not important that they mixed one fourth or fifth of inferior ore to further a sale of the whole, unless such mixture resulted in a less price than the market price for this Anisetto ore ; if it did, that does not bar their right, it only compels them to account for the

market price of the Anisetto ore. If the price they got for the mixture was less than they could have got for the Anisetto, the price of the mixture does not determine their damages, but the market price of the Anisetto deducted from the contract price. This market price, plaintiffs claim, from the testimony, was only 4s. 6d. per ton, instead of the 6s. contract price. That is a matter of evidence for the consideration of a jury. We only say, plaintiffs were not bound to pay wharfage, and refrain from making a sale of their own ore, after defendant had broken his contract.

We conclude: 1. That it was error to reject the evidence of the trade custom at the place the contract was to be performed. 2. That the true measure of damages is the difference between the contract price and the market price of the ore at the point of delivery at the date it was sold.

The judgment is reversed, and a venire facias de novo awarded.