## Philadelphia v. The Hertz Corporation

*Pace Reich,* for plaintiff.
*Jerome J. Shestack,* for defendants.

CHALFIN, *J.*, January 7, 1977—These are actions in assumpsit brought by the City of Philadelphia against the Hertz Corporation, Avis Rent-A-Car System, Inc. and National Car Rental System, Inc. They were consolidated and tried together before this court sitting without a jury.

Hertz, Avis and National are in the business of renting motor vehicles throughout the country and are the three largest in the industry. In addition to renting cars out of private locations, the companies also conduct car rental operations and store vehicles at most major airports throughout the nation, including Philadelphia International Airport. For this purpose the city, which owns the Philadelphia International Airport, leases space to the three defendants, under written agreements which are similar in substance.

The lease agreements provide that as monthly rent each company shall pay ten percent of its "gross revenues" as defined in the agreements.[1] Under these contracts, which have been in effect since 1966 and renewed without change, the defendants have reported and paid to the city the agreed percentage rental on all car rental fees derived from their operations at Philadelphia International Airport. After an audit in 1973 by the city controller, the city for the first time took the position defendants were understating their gross revenues and instituted this action.

The dispute concerns the construction of the gross revenues provision. Specifically, the issue is whether the companies understated their gross revenues by including only amounts they actually charged their customers while excluding discounts granted to volume and certain credit card customers. We conclude defendants did not so understate their gross revenues and therefore enter judgment in favor of all three defendants.

The city contends that, under the contract definition of gross revenues, discounts given by the car rental companies to volume or credit card customers (the discounted rate is usually 20 percent less than the standard rate) should be included in gross revenues for purposes of computing the city's rental commission.[2] This is illustrated by a simple example. Assume á credit card or volume customer rents a car and is entitled to pay a discounted rate of 20 percent less than the standard rate. If the charge is $100 under the standard rate, the customer would

1. The rent provision is the same for each defendant.

2. The city does not contest the companies' authority to grant such customer discounts; the lease agreements specifically provide that such discounts·are permissible.

be charged $80. The city claims the percentage rental should be computed on the prediscount amount, $100. Therefore, the city now claims it should recover the difference—the rental percentage on the amount of such customer discounts.[3]

Defendant companies contend that under the contract definition and the plain meaning of the words "gross revenues" are moneys actually received[4] by the companies and cannot include sums for which customers are not billed or charged. They seek to bolster their position through evidence of (a) the intent of the parties at the time the definition of gross revenues was drafted, (b) the parties' subsequent conduct and (c) trade usage and custom in the airport car rental industry.

## THE LANGUAGE OF THE CONTRACT

The words the parties used in the contract must be accorded their ordinary meaning: Pines Plaza Bowling, Inc. v. Rossview, Inc., 394 Pa. 124, 145 A.2d 672 (1958); see 3 Corbin on Contracts §534 (1951 ed.). The lease agreements provide that the rent shall be 10 percent of "gross revenues" and define the term.

"Gross revenues are hereby defined as including, but not limited to, gross time and mileage charges, charges to customers for waiver of collision dam-

---

3. Pursuant to a stipulation between the city and defendants, this action covers only defendants' gross revenues from Philadelphia International Airport operations for the six-year period January 1, 1968, through December 31, 1973.

4. The question of who bears the credit risk and such losses for percentage rental purposes is not in dispute. The companies have since 1963 conceded that they must bear such risks and losses and the present contracts now so provide.

age, gasoline, oil, or maintenance and any and all other gross charges to customers for sales of service or supplies in the ordinary course of Lessee's business; all of the foregoing to be includable in gross revenues whether actually charged or chargeable to customer. It is understood and agreed that all credit risks, losses or deductions are to be borne solely by Lessee and that Lessor is to be paid on the gross revenues without charge or reduction for credit costs or losses. There shall be excluded from gross revenues only the proceeds to Lessee from any insurance policy or any other source by reason of loss, damage or conversion of Lessee's property, and the amount of any local, state, or federal taxes separately stated to and collected from the customer and remitted directly by Lessee to the taxing authority."

The city urges that in the phrase "gross time and mileage charges" the term gross contemplates such charges before discounting, and therefore gross revenues should include prediscounted rates.

Defendants contend that since the lease agreements specifically allow the companies to establish discounted rates "it makes no sense to say in the lease that a discount price may be established and then to later argue that the car rental companies still have to pay the city as if such discount prices had not been given." Defendant's trial brief at 8.

As plaintiff the city, of course, has the burden of demonstrating by a preponderance of the evidence that its construction of the contract should prevail. Further, fundamental rules of construction mandate that writings are to be construed against the draftor, such that ambiguities are resolved in favor of the nondrafting party: Com. v. Brothers Valley

Co., 427 Pa. 499, 235 A. 2d 597 (1967); 8 P.L.E. Contracts,194 §155(1971). The city drafted the lease agreements involved here, including the definition of gross revenues. Therefore, were we to find the contracts ambiguous, we would be obliged to conclude that plaintiff did not meet its burden of proof, and find in favor of defendants.[5]

After a careful and thorough review of the lease agreements without resort to extrinsic evidence on the issue of whether the stated definition of gross revenues includes prediscounted rates, we conclude the agreements—giving the words their ordinary meaning—are ambiguous. Specifically, we find ambiguous the operative provision defining gross revenues as "gross time and mileage charges . . . whether actually charged or chargeable to cus-

---

5. The dictionary does not bolster the city's construction of the term gross revenues; to the contrary, the standard definition supports defendants' view. For example, Webster defines revenue as "an item of income; the total income produced by a given source." Webster's Third International Dictionary of the English Language (1963 ed.). "Income," in turn is defined as "commercial revenue or receipts of any kind." Webster, supra. Thus, gross revenues are gross income or gross receipts. No matter what one calls it, gross revenues are moneys one receives or takes in. This concept of the meaning of gross revenue has received unflagging adherence from Pennsylvania courts. The Supreme Court of Pennsylvania in Com. v. General Electric Company, 412 Pa. 123, 130-31, 194 A. 2d 139, 142 (1963), reasoned that "a 'receipt' is *that which comes in* in distinction from that which is expended or paid out." (Emphasis supplied.) Similarly, in Philadelphia v. Holmes Electric Protective Company, 335 Pa. 273, 277, 6 A. 2d 884, 886 (1939): "Gross receipts . . . from all its business" were understood to import in economic terms "all receipts arising from the employment of its capital." And in Com. v. General Electric Company, 77 Dauph. 395, 397 (1961), the court quoted Webster when it construed the term gross receipts as "that which is received."

tomer." Can prediscount time and mileage charges be properly characterized as "gross," and "chargeable" to the customer? We also find the next sentence ambiguous: "It is understood and agreed that all credit risks, losses or *deductions* are to be born solely by lessee and that lessor is to be paid on the gross revenues *without charge or reduction* for credit costs or losses." Are customer discounts "deductions" within the purview of this sentence? The last sentence of the definition is also unclear: "There shall be excluded from gross revenues *only* [casualty insurance proceeds and taxes collected from the customer]." Does this sentence affect the status of items *not* otherwise includable in gross revenues? Moreover, while purporting to define gross revenues, the agreement by its terms does not limit what is to be included. Thus the definition begins "[g]ross revenues are hereby defined as including, *but not limited to* . . . " We therefore find the contract definition of "gross revenues" is ambiguous regarding the issue of whether it includes prediscounted rates. But we need not resolve the ambiguity merely by resort to consideration of the burden of proof and canons of construction.

Pennsylvania's Supreme Court has declared that in construing an ambiguous contract provision the court may consider evidence extrinsic to the contract itself in an effort to ascertain the intent of the parties at the time the contract was made; such intent is then given effect in resolving the ambiguity. In Rochester and Pittsburgh Coal & Iron Co. v. Makoma Coal Co., 271 Pa. 394, 114 Atl. 261 (1921), the court stated:

"The parties to a contract in which there exists ambiguity have always a right to put their own construction upon it and if it appears that such

construction was mutual it may be accepted by the court and jury, although it might not be the construction the court would put upon it by an inspection of the instrument alone . . . The writing must be permitted to operate according to the intention of the parties, and, when the meaning is doubtful, the circumstances attending its execution and the subsequent acts of the parties may always be considered in determining the intent with which the words were used. . . Such testimony does not seek to vary the terms of the writing nor to show that anything was omitted from its provisions, but merely tends to prove the meaning of the parties at the time the contract was executed." 271 Pa. at 398, 114 A. at 262 (citations omitted).

We thus proceed to consider evidence of such intent.[6]

## INTENT OF THE PARTIES WHEN THE GROSS REVENUES CLAUSE WAS DRAFTED

Undisputed evidence at trial discloses the following. Written lease agreements were in effect before 1963, but the gross revenues clause in its present form first appeared in lease agreements dated November 13, 1963. This clause was the result of negotiations between the city and defendant companies on the issue of whether certain items not here involved were to be included in gross rev-

---

6. We need pause only briefly to consider whether such evidence is barred by the parol evidence rule; our supreme court has declared that "where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by language of the instrument or by extrinsic or collateral circumstances." Herr Estate, 400 Pa. 90, 94, 161 A. 2d 32, 34 (1960).

enues.[7] A compromise was struck and the current clauses were drafted memorializing the understanding. Throughout the course of those negotiations at no time was the issue here presented considered or discussed by the parties. Before the 1963 revision, the city did not request or even expect, nor did the companies pay, percentage rental on pre-discounted rates—the city collected the percentage rental only on amounts the companies received from their customers.

This clearly demonstrates that at no time during the negotiations resulting in the 1963 definition was there an intent to include in gross revenues those amounts the city seeks here, and that all available indications lead toward a contrary result. Accordingly, we next consider the conduct of the parties after the 1963 revision.

## SUBSEQUENT CONDUCT OF THE PARTIES

In this area as well, our Supreme Court has encouraged the use of surrounding circumstances as an aid in explaining the terms of a contract. In Demharter v. First Federal Savings & Loan Association of Pittsburgh, 412 Pa. 142, 194 A. 2d 214 (1963), the court explained, "the construction placed upon a contract by the parties themselves is worthy of great consideration and generally will be adopted, particularly when such construction is made prior to the occurrence of any controversy or litigation." 412 Pa. at 154, 194 A. 2d at 220.

After the 1963 revision and well before this con-

7. The disputed items involved customer charges for collision damage waiver premiums, revenue from rentals in which the car was rented at but not returned to the airport and whether credit losses (bad debts) should be included in gross revenues.

troversy, the companies were paying percentage rental only on the actual amounts received from their customers, without objection from the city— even though the city's policy-making officials knew such discounts were being made and that the discounted rate was being used for percentage rental purposes. S. Harry Galfand, Esq., former City Representative, Director of Commerce and supervisor of concessionaire contracts at the airport from 1968 through 1971, testified that he knew of this practice and sought no change. City officials who were involved in airport concession agreements and operations under Mr. Galfand, William T. Burns and David G. Davis, both former Deputy Directors of Commerce for Aviation, testified similarly.

Thus, the uncontradicted evidence established that, at all material times prior to the 1973 audit, the appropriate city officials viewed the lease agreements as applicable only to those amounts actually charged airport car rental customers. These officials never sought to include prediscounted amounts at the time the lease agreements were renegotiated and renewed. This supports defendant's construction of the lease agreements and also the inference that, upon the 1969 renewal, this policy was incorporated into the lease agreements.[8]

8. We find no meaningful distinction between this situation and one in which the court interprets a statute and the legislature thereafter legislates on the same subject without changing the provision. In such cases the court's interpretation is considered the proper construction as being incorporated by the legislature. See, e.g., Shapiro v. U.S., 335 U.S. 1 (1948); John Hancock Mutual Life Ins. Co. v. Helvering, 128 F. 2d 745 (D.C. App. 1942); Marubeni-Iida, Inc. v. Toko Kaiun Kabushiki Kaisha, 327 F. Supp. 519 (S.D. Tex. 1971).

## CONCLUSION

After reviewing the terms of the lease agreements at trial, we concluded the contracts are ambiguous. We therefore admitted extrinsic evidence in our effort to determine and give effect to the parties' intent.

The operative phrase in the definition "gross time and mileage charges. . . whether actually charged or chargeable to customer" is now clear. If an item is not a "charge," it cannot be included in gross revenues. Common sense and the dictionary dictate that a "charge" is something one at least hopes or expects to receive from another. The evidence made clear that Hertz, Avis, and National never bill or charge such customers more that the discounted rate; the prediscounted rate is merely a figure used for computing the actual customer charge. Consequently, the amount of such discounts are never "chargeable" to the customer.

Nor are such amounts "credit risks, losses or deductions" or "credit costs or losses." These phrases were not intended to encompass customer discounts. As the drafting history makes plain, this was merely intended to state that credit expenses or accounting costs could not be subtracted from gross revenues.

## CUSTOM IN THE AIRPORT CAR RENTAL INDUSTRY

Defendants sought to introduce evidence that the custom in airport car rental operations throughout the nation is to include for percentage rental purposes only such amounts actually charged to customers, and not prediscounted rates. Over the city's objection, this evidence was admitted.

The Supreme Court of Pennsylvania has long embraced the use of relevant custom or usage of an industry to explain terms of a contract: Guillon v. Earnshaw, 169 Pa. 463, 32 Atl. 545 (1895); Phoenix Iron Co. v. Samuel, 13 W.N.C. 50 (1883); Carey v. Bright, 58 Pa. 70 (1868). Although such evidence cannot be permitted to vary the express terms, custom or usage is admissible to assist the court in ascertaining the real meaning and intention of the parties, where this cannot be done by merely relying on the terms of the contract: Electric Reduction Co. v. Colonial Steel Co., 276 Pa. 181, 120 Atl. 116 (1923).[9] This rule has been carried forward and extended in Pennsylvania by enactment of the Uniform Commercial Code of April 6, 1953, P.L. 3, as amended, 12A P.S. §2-202(a), together with the official comments thereto which makes it abundantly clear that custom and trade usage become part of sales contracts—ambiguous or unambiguous—unless specifically excluded by the parties.[10] The contracts here, of course, do not con-

---

9. There, the court made short shrift of challenges based on the parol evidence rule. "The parol evidence rule does not apply in its ordinary strictness where the existence of a custom or usage to explain the meaning of words in a writing is concerned." 276 Pa. at 186, 120 Atl. at 118.

10. U.C.C. section 2-202 (a) provides that "Terms . . . may be explained or supplemented . . . by course of dealing or usage of trade . . ." The official comment to this section reads in pertinent part:

"[This section] makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and usages of trade were taken for granted when the

cern the sale of goods, but the lease agreements are sophisticated commercial instruments, the subject of vigorous arms length negotiations; thus, we see no reason not to apply the code by analogy.[11] Hence, the concept of admitting evidence of custom or usage in an industry to explain the meaning of terms of a contract is deeply rooted in our common law and embodied in our statutory law, thus keeping our jurisprudence in step with sound commercial practice. We therefore see no reason in logic or law for excluding such evidence here.

The evidence was undisputed. Most major airports in the nation contain car rental concessions for which the airport authority leases space to the companies. Typically, the rent is 10 percent of customer charges generated by airport car rental operations. The three defendants here lease space at most major airports in the country under these

---

document was phrased. *Unless carefully negated they have become an element of the meaning of the words used."* U.C.C. §202(a), Comment 2. (Emphasis supplied.)

11. Other courts have done so when the code's rationale applies: Vitromar Piece Dye Works v. Lawrence of London, Ltd., 119 Ill. App. 2d 301, 256 N.E. 2d 135 (1970) (service contract); Vitex Mfg. Corp., Ltd. v. Caribtex Corp., 377 F. 2d 795 (3d Cir. 1967) ("While this contract is not controlled by the Code, the Code is pursuasive here because it embodies the foremost modern legal thought concerning commercial transactions."); Transatlantic Financing Corp. v. U.S., 363 F. 2d 312 (D.C. Cir. 1966) (contract for carriage of goods under Federal common law); Hunt Foods & Industries, Inc. v. Doliner, 267 N.Y.Supp. 2d 364 (S. Ct. 1966) (section 2-202 "liberalizes" parol evidence rule and should apply to contract situations other than sales of goods, such as an option for the sale of stock). See also Traynor, Statutes Revolving in Common-Law Orbits, 17 Cath. University L. Rev. 401, 422 et seq. (1968) and Note; The Uniform Commercial Code as a Premise for Judicial Reasoning, 65 Colum. L. Rev. 880 (1965).

terms. *No other airport in the nation collects or attempts to collect percentage rental on prediscounted rates—the airports receive a percentage only on actual customer charges.* What is abundantly clear, then, is that the custon in the airport car rental industry is to include for rental percentage purposes only such amounts the companies actually bill or receive from their customers.

The concluding sentence of the definition, which says "there shall *only* be excluded from gross revenues" the stated items, also fits into place. The drafting history discloses that unless this sentence was added, the status of casualty insurance proceeds and taxes received by the companies might be in doubt. Both are amounts actually received by the companies and, it might have been argued, they fall within the purview of "gross revenues." They are, of course, different from customer discounts, which companies never receive or even hope to receive; hence, the separate treatment.

After careful review of the contract definition of gross revenues—in light of the admissible evidence—we conclude this term as used in the lease agreements means those moneys actually received or due from defendants' airport car rental customers.[12] Therefore, defendants were obligated to pay to the city ten percent of these amounts and not a percentage of prediscounted amounts.

For these reasons, we enter judgment in favor of all three defendants.

---

12. In view of our holding, we need not consider defendants' further defense of estoppel.