Commonwealth *v.* General Electric Company,
Appellant.

Argued May 27, 1963. Before Bell, C. J., Musman-
no, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*John McI. Smith,* with him *Nauman, Smith, Shissler & Hall,* for appellant.

*Edward T. Baker,* Deputy Attorney General, with him *Walter E. Alessandroni,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 9, 1963:

This appeal involves a construction of the term "gross receipts" as contained in the statutory definition of the denominator[1] of the gross receipts fraction of the formula used to determine net income subject to tax under the "Corporate Net Income Tax Act" of 1935.[2] Specifically, did the utilization by a taxpayer of tax anticipation notes (1% Treasury Certificates of Indebtedness) to pay federal income taxes result in "gross receipts" includable in the denominator of the third fraction of the taxpayer's corporate net income return for 1955?[3]

General Electric Company (taxpayer), a New York corporation with its fiscal offices outside Pennsylvania, on and after August 2, 1954 in New York State purchased, either by original subscription or on the open market, $72,000,000 U. S. Treasury Certificates

---

[1] ". . . whose denominator is the amount of the taxpayer's *gross receipts* from all its business." (Emphasis supplied)

[2] Act of May 16, 1935, P. L. 208, as amended and reenacted, 72 PS §3420.a et seq.

[3] In tax years subsequent to January 1, 1956 this question will not arise. By an amendment to the Act (Act of March 6, 1956, P. L. (1955) 1247), "gross receipts", with an exception not presently pertinent, no longer includes "receipts" from "the sale, redemption, maturity or exchange of securities."

of Indebtedness, 1% Tax Anticipation Series, 1955. While such purchases in the amount of $72,000,000 are directly involved in this controversy, counsel have stipulated that the factual situation surrounding the purchase and ultimate disposal of $42,000,000 of such certificates is illustrative of the entire problem and so we consider the lesser, rather than the larger, amount of the entire purchases.

On July 16, 1954, the U. S. Treasury offered for public subscription $3,500,000,000 1% Treasury Certificates of Indebtedness, Series "C", 1955, Tax Anticipation Series. These certificates, dated August 2, 1954, bore interest at 1% per annum from the date of issue and were payable at maturity on March 22, 1955 and were not to be "subject to call for redemption prior to maturity". It was provided that such unregistered certificates would "be accepted at par plus accrued interest to maturity in payment of income and profits taxes due March 15, 1955". On original subscription, the taxpayer purchased $20,000,000 of these certificates and, thereafter, on the open market, an additional $22,000,000. On March 7 and 8, 1955, the taxpayer delivered to the Federal Reserve Bank of New York (Bank) certificates aggregating $42,000,000 face value and received from the Bank certain receipts. These receipts, addressed to the Director of Internal Revenue at Albany, N. Y. (Director), recited that Treasury Certificates of Indebtedness aggregating $42,266,959.12 ($42,000,000 principal and $266,959.12 interest) were held by the Bank "for redemption and application of the proceeds in payment of taxes due" on March 15, 1955 from the taxpayer. As of March 15, 1955, the taxpayer delivered these receipts in the amount of $42,-266,959.12 to the Director in part payment of taxpayer's first quarterly installment of federal income taxes.[4]

---

[4] The net book loss was $82.66 which represented the unamortized portion of a premium paid on the purchase of the certificates

Taxpayer claimed that the *entire* amount of the principal and interest constituted "gross receipts" which should be included in the denominator of the gross receipts fraction in calculating its 1955 net income tax. The Commonwealth took the position that, while the amount of interest was includable as "gross receipts", the amount of the principal was not. After exhaustion of the administrative procedures under the Act, the taxpayer appealed to the Court of Common Pleas of Dauphin County. After a trial without jury and upon stipulated facts, that court entered a judgment in favor of the Commonwealth and against the taxpayer and from the entry of that judgment this appeal was taken.

The taxpayer's theory is that it employed its capital funds to the extent of $72,000,000 to make an *investment* in these negotiable government securities and, in accordance with the terms and provisions of such securities, the government *redeemed* them and that the proceeds derived from such redemption and received by the taxpayer constituted "gross receipts" under the decisions in *Commonwealth v. Rockwell Manufacturing Co.*, 71 Dauphin Co. Rep. 67, 70, aff'd. 392 Pa. 339, 140 A. 2d 854, and *Commonwealth v. Koppers Co., Inc.*, 397 Pa. 523, 156 A. 2d 328.

The Commonwealth's theory is that the taxpayer's disposition of the tax anticipation certificates did not result in a *receipt* to but rather an expenditure by the taxpayer, that there was no sale or redemption of these securities, that the transaction involving these securities was not a necessary part of taxpayer's business giving rise to income and that the transaction simply constituted a prepayment of income taxes and the proceeds therefrom are excluded from the gross receipts

and was part of a total loss of $698.27 reported in taxpayer's federal income tax return and the interest income of $266,959.12 was reported in said return as ordinary income.

fraction under *Commonwealth v. Rockwell Manufacturing Co.*, 71 Dauphin Co. Rep. 67, supra.

In this field of the law certain principles have been established. Where a foreign corporation, registered to do business in Pennsylvania, receives proceeds from bonds which matured or were called, such receipts are "gross receipts" includable in the denominator of the gross receipts fraction: *Commonwealth v. Eaglis Corporation*,* 55 Dauphin Co. Rep. 356, 56 Dauphin Co. Rep. 227.[5] Where a foreign corporation, registered to do business and having in Pennsylvania its chief place of business where its fiscal affairs are transacted, voluntarily sells securities in the course of its business and necessary thereto, the proceeds from such sale are includable in both the numerator and the denominator of the gross receipts fraction: *Commonwealth v. Electric Storage Battery Co.*,* 57 Dauphin Co. Rep. 201. Proceeds from the sale or redemption of securities are likewise includable in the gross receipts fraction: *Commonwealth v. Rockwell Manufacturing Co.*, 71 Dauphin Co. Rep. 67, 70.[6] Gross proceeds from the conversion of assets, by sale or maturity, and gross income from investment are gross receipts for determining the gross receipts allocation fraction: *Commonwealth v. Koppers Co., Inc.*, supra, pp. 528, 529. ". . . intangibles which are a necessary part of corporate activity and are within the framework of the corporate functioning, actively or as reserve, may be considered in determining the tax . . . .": *Commonwealth v. Koppers Co., Inc.*, supra, p. 531. The normal definition of "gross receipts", prior to the 1956 amendment, would

---

* While these cases dealt with "franchise taxes" the principle is equally applicable in "corporate net income tax" cases.

[5] In *Commonwealth v. Eaglis Corporation*, 354 Pa. 493, 47 A. 2d 661, this point was not contraverted by the Commonwealth.

[6] See also: *Commonwealth v. Rockwell Manufacturing Co.*, 392 Pa. 339, 140 A. 2d 854.

have dictated the inclusion at all times of gross proceeds from the sales, redemptions, maturities or exchanges of securities as allocation factors in the gross receipts fraction: *Commonwealth v. Koppers Co., Inc.,* supra, p. 529.

In the case at bar, the taxpayer took $72,000,000 of its funds and purchased these government securities both by original subscription and on the open market. In its initial opinion (p. 56a), the court below characterized this transaction as "a temporary investment of money set aside for taxes and for the actual use of payment of tax". In its later opinion (p. 71a), the court stated: ". . . the securities were not 'investments' in any sense of the word for the [taxpayer] did not put its money into these certificates with the intention of securing income or profit" but for the purpose of paying its income taxes with them. In and of itself it is relatively unimportant what *label* we attach to the type of transaction whereby the taxpayer put its funds into these certificates. However, the taxpayer urges that the transaction was an *investment* by it which falls squarely within *Koppers,* supra, wherein the Court said (p. 533) : "Lastly, proceeds from all securities in which the corporation *invests* are included in the gross receipts fraction . . . ." (Emphasis supplied). In *Koppers,* the Court's reference was to *investments* in the usual and ordinary sense of that term, i.e., where a corporation, for the purpose of an enhancement of the value of its principal and/or for an increase in the yield of income from such principal, purchases securities; inherent in such venture is a calculated risk of the principal and its dominant purpose is clearly the production of profit or income for general corporate purposes. In the case at bar, when the taxpayer purchased these certificates, it did, in a sense, *invest* such funds (cf: *Arbuckle's Estate,* 324 Pa. 501, 510, 188 A. 758) but its investment was of a totally

different kind and character from the ordinary and usual investment. The corporate funds which the taxpayer utilized had been earmarked for the payment of its federal income and profits taxes which would fall due on March 15, 1955. In the placement of its funds in these securities, the taxpayer's dominant purpose was the preservation, not the enhancement, of the principal and the payment of taxes, not the production of income for corporate purposes. The attractive feature of such securities to the taxpayer lay in the fact that such securities served its dominant purpose and at the same time provided a small yield of income. The placement by the taxpayer of its funds in these securities involved no risk of principal and was in the nature of a deposit by the taxpayer of its tax-earmarked funds and for the use of such funds, while on such quasi-deposit, the government paid interest until such time as the taxes became actually due and payable.[7] Even if such transaction be considered an *investment* of funds, it was not the type of *investment* contemplated by this Court in *Koppers*.

The Commonwealth urges that, even if the purchase of these securities constituted an *investment,* the proceeds of such investment are not includable in "gross receipts" because (a) these certificates were not used "to produce income for general corporate purposes" but to pay taxes, "an expenditure or the extinguishment of a current liability" and (b) no sale, redemption, maturity or exchange of securities arose from the transaction.

The denominator in the tax fraction is "the amount of the taxpayer's gross receipts from all its business . . . ." In *Philadelphia v. Holmes Electric Protective Co.,* 335 Pa. 273, 277, 6 A. 2d 884, this Court de-

---

[7] "Gross receipts" and "gross income" are not synonymous, the former being broader: Mertens, Law of Federal Income Taxation, Vol. 1, §5.10 and cases therein cited.

fined the phrase " 'the gross receipts of said corporation' . . . 'from all its business' " in the following manner: ". . . 'the gross receipts of said corporation'—not some of the gross receipts—'from all its business'—not some of its business or such part of its business as requires a franchise or license from the City. . . . By 'gross receipts . . . from all its business' must be understood all receipts arising from the employment of its capital."[7] "Gross receipts" must arise from the "employment of the capital" of the corporation; implicit therein is the requirement that such "employment" of capital be for the purpose of corporate profit and income production. In making *investment,* in the commonly accepted sense of that term, the corporation does so for the purpose of corporate profit or income production. In the case at bar, the underlying purpose of the purchase of the certificates was not the production of corporate profit or income but the payment of corporate tax obligations. In effect, by the purchase of these certificates, the taxpayer prepaid its federal taxes and the government paid the taxpayer for the use of its money in the interim period between the date of purchase and the date the taxes were due.[8] Nothing in the transaction reveals the "employment" of taxpayer's funds for corporate profit or income; on the contrary, the transaction, a prepayment of taxes, constituted an expenditure of funds. The proceeds of the transaction did not constitute "receipts" by the taxpayer; a "re-

---

[7] "Gross receipts" and "gross income" are not synonymous, the former being broader: Mertens, Law of Federal Income Taxation, Vol. 1, §5.10 and cases therein cited.

[8] It is true that the provisions of these certificates did not command their utilization *only* for tax payments. The bearer could either use the proceeds for tax payments on March 15, 1955 or hold them until March 22, 1955 and, if the taxpayer chose to employ these certificates for tax payments, he received a bonus of one week's interest. However, the taxpayer's main purpose was to utilize the certificates for tax payments.

ceipt" is that which comes in in distinction from that which is expended or paid out. The taxpayer here *received* nothing but *expended* its money in payment of a corporate obligation and, insofar as the principal of its funds was concerned, the funds were not placed in these securities to "make money" but "to pay" its taxes. That which the transaction produced did not constitute "gross receipts" under the statutory definition.

In view of the conclusions reached, we need not consider whether there was a disposition of these certificates by a sale, a redemption, maturity or an exchange.

In its brief, the Commonwealth posed a pertinent question: "If [the taxpayer] had not purchased these securities, but retained the cash or other assets used to purchase the securities, and paid the federal income tax directly with this cash, would [the taxpayer] argue that they were gross receipts?" Obviously, the answer is that it could not so argue. The taxpayer, by its purchase of these certificates, sought to accomplish the same end in another method and its resort to such method does not change the result.

By the purchase of these certificates, the taxpayer, in effect, then and there paid in advance a future tax obligation and, for the use of that money until the tax was due, the government paid interest to the taxpayer, which interest the Commonwealth allowed as a "receipt". Insofar as the principal of taxpayer's funds are concerned, this was not a transaction from which "gross receipts" arose within the legislative definition of the denominator of the tax. To hold otherwise would distort the legislative intent and ignore the realities of the transaction.

Judgment affirmed.

Mr. Chief Justice BELL dissents.