Halco (Mining) Inc., Appellant *v.* Commonwealth of Pennsylvania, Board of Finance and Revenue, Appellee.

Argued February 6, 1980, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, BLATT, CRAIG and MACPHAIL. Judges ROGERS and WILLIAMS, JR. did not participate.

*Edward J. Greene,* with him *Janice C. Bowers, Eckert, Seamans, Cherin & Mellott,* for appellant.

*Vincent J. Dopko,* Deputy Attorney General, for appellee.

OPINION BY JUDGE BLATT, May 20, 1980:

Halco (Mining) Inc., hereinafter Halco, timely filed its 1973 franchise tax report pursuant to Article VI of the Tax Reform Code of 1971.[1] (Code) The franchise tax report was settled on June 19, 1975 and reflects the determination by the Department of Revenue that Halco was not allowed the preferred "holding company" status for purposes of the tax. Halco filed a Petition for Resettlement which was denied. It then filed a Petition for Review with the Board of Finance and Revenue (Board) which was also denied.[2] This appeal followed with the parties submitting a Stipulation of Facts.

---

[1] Act of March 4, 1971, P.L. 6, §601, *as amended,* 72 P.S. §7601.

[2] The Board is comprised of the State Treasurer, the Attorney General, the Secretary of the Commonwealth, the Auditor General and the Secretary of Revenue. In the instant case, both the Secretary of the Commonwealth and the State Treasurer dissented from the denial of the petition.

It is Halco's position that it qualifies as a holding company under Section 602(f) of the Code, 72 P.S. §7602(f) and is therefore entitled to calculate its franchise tax at the rate of ten mills upon each dollar on a maximum of only ten percent of the actual value of its entire capital stock. The term "holding company" is defined in Section 602(f) as

> [A]ny corporation (i) at least ninety percent of the gross income of which for the taxable year is derived from dividends, interest, gains from the sale or other disposition of stock or securities and the rendition of management and administrative services to subsidiary corporations, and (ii) at least sixty per cent of the actual value of the total assets of which consists of stock securities or indebtedness of subsidiary corporations.

It is undisputed that Halco meets the criteria of (ii) above, and the sole issue is whether or not ninety percent of its gross income for the year 1973 was derived from the enumerated sources.

Halco is a Delaware corporation having its principal place of business in Pittsburgh. It was incorporated in 1953 and has been utilized to participate with the Republic of Guinea in mining bauxite in that West African country. Halco owns fifty-one percent of the stock of Compagnie des Bauxites de Guinee (CBG) a corporation formed to aid in the bauxite mining. The other forty-nine percent of the stock is owned by the Republic of Guinea. Halco provides management services to CBG and instrumentalities of the Government of Guinea. In pursuing its program for economic development through bauxite mining, Guinea has experienced difficulty in obtaining equipment and raw material from suppliers outside the country due to the fact that its currency known as the syli is unconvertible and thus has little power in the world market.

On a number of occasions, therefore, Guinea has requested Halco, its co-sharehold in CBG to assist in obtaining goods which it needs from the world market. In 1972 Halco purchased aluminum sheet for a Guinean government corporation (S.O.G.U.I.F.A.B.) with its useable currency and took its payment from Guinea in sylis. Halco charged the corporation $730,299 for the aluminum which was exactly the price it had paid for it on the world market.

Halco also obtained a wholly-owned subsidiary known as the Guinean Manufacturing Company (GMC). The purpose of GMC is to fabricate corrugated aluminum sheets as well as kitchen utensils for the Guinean market. During 1971 the Guinean government advised Halco that it wished to assume all of the business operations theretofore conducted by GMC. As part of the transfer plan Halco immediately received 1,324,787,214 Guinean francs, 166,438,265 of which were immediately convertible into United States dollars by the sale of the Guinean francs to CBG. The remaining balance of 1,158,303,949 Guinean francs was maintained in Guinea and was convertible into U.S. dollars at the rate of 25% per year by the sale of the Guinean francs to CBG for the appropriate amount of U.S. dollars. In addition, Halco received a promissory note in the amount of 336,191,949 Guinean francs, a percentage of which was paid each year between 1972 and 1976. Again as each payment was made on the promissory note in Guinean francs, the francs were sold to CBG for U.S. dollars.

The Guinean francs received by Halco constituted "blocked currency", *i.e.*, due to restrictions imposed by the Guinean Government on the expatriation of its currency from Guinea, Halco was forbidden to transfer the Guinean francs out of Guinea. Because there did not exist alternative avenues of investment in Guinea, Halco was forced to allow the francs to remain

idle in Guinean bank accounts. The official unit of Guinean currency is now the syli which replaced the franc. In 1973 Halco was able to convert some of its Guinean sylis by selling them to the CBG in accordance with the plan outlined above. Due to changes in the official rates of exchange between the United States dollar and the syli which took place between 1971 and 1973, Halco received a total of $285,261.94 more in 1973 than it would have received had the sylis been convertible and actually converted into U.S. currency in 1971 when Halco actually received them.

In denying Halco "holding company" status, the Board contends that the "ninety percent test" was not met because (1) the $730,929 received by Halco from the aluminum sheet delivery is "gross income" as that term is set forth in the Code and (2) the gain realized on the currency exchange was not income derived from any of the enumerated sources set forth in the relevant section of the Code and is therefore not gross income for holding company purposes.

We can state the issues therefore as follows: (1) For purposes of the Pennsylvania Franchise Tax rate on qualified holding companies, is the term "gross income" synonymous with "gross receipts" or is it to be construed as gross receipts less the costs of goods sold and (2) do gains realized upon the sale of blocked currency received upon liquidation of a subsidiary constitute holding company income?

The parties have agreed that in order for Halco to succeed in this appeal it must obtain a favorable decision on both issues.

The franchise tax provisions of the Code do not contain a definition of "gross income". Halco contends that the term must mean gross receipts less the cost of goods sold; the Board, on the other hand, argues that the terms gross income and gross receipts are synonymous. The question of the proper construc-

tion of the term in the context of the franchise tax is one of first impression.

In *Commonwealth v. General Electric Co.*, 412 Pa. 123, 194 A.2d 139 (1963), the Supreme Court addressed the issue of the correct definition of the term "gross receipts" for purpose of the Corporate Net Income Tax Act of 1935.[3] In the only reference to the term "gross income" the Court in a footnote cited Merten's, Law of Federal Income Taxation for the proposition that " 'Gross receipts' and 'gross income' are not synonymous, the former being broader." 412 Pa. at 129 n. 7, 194 A.2d at 142 n. 7. While this statement is not dispositive of the issue in the instant case it does evidence an acceptance by our Supreme Court of the principle that the terms are not synonymous. In fact, the relevant section cited by the Supreme Court states: "Thus it is recognized that the cost of goods sold is to be excluded from gross receipts in arriving at gross income." 1 J. Merten's, Law of Federal Income Taxation, §5.10 (1974). This is, of course, exactly the construction advanced by Halco.

While federal case law interpreting the term "gross income" for federal tax purposes is not binding on this Court, is it enlightening to consider the holdings of the federal cases. In *Laguna Royalty Co.*, 27 T.C.M. (CCH) 164, 167 (1968) aff'd 406 F.2d 703 (5th Cir. 1969), the Court was confronted with the proper construction of the term "gross income" under the personal holding company provision of the Internal Revenue Code of 1954.[4] It found that:

> The proposition that 'gross income' is not synonymous with 'gross receipts' is one of long standing.

---

[3] Act of May 16, 1935, P.L. 208, repealed by the Act of March 4, 1971, P.L. 86, *as amended*, 72 P.S. §7411.

[4] I.R.C. §537.

In addition, for purposes of computing a taxpayer's gross income derived from business, the federal regulations provide that "[i]n a manufacturing, merchandising or mining business 'gross income' means the total sales, less the cost of goods sold." Treas. Reg. 1.61-3(a) (1979).

In determining the legislature's intended construction of the term, of course, it is important to ascertain how the term or similar terms are used in other sections of the statute. In this regard we note that, in Article IV of the Code pertaining to Corporate Net Income Tax, the term "gross receipts" is used in reference to sales. This leads to the conclusion that if the legislature had intended the "gross income" provisions of the franchise tax statute to mean "gross receipts" it would have used that term as it did in the parallel statute.

Perhaps the most compelling reason for accepting Halco's interpretation of the term, however, can be seen in the following example advanced by it:

Assume that in a given year a corporation sells stock for $500,000 for which it paid $400,000 and this is its only income. If gross income means gross receipts, this company would not qualify as a holding company even though its only income was holding company income, because the gain from the sale of the stock, $100,000, is only 20% of the gross receipts of $500,000. If, however, gross income means gross recepts less the cost of goods sold 100% of the company's income would be holding company income. The gain of $100,000 would be 100% of the gross income of $100,000 (gross receipt of $500,000 minus the cost of goods sold $400,000).

It seems clear to us, therefore, that the construction advanced by Halco is the only reasonable one under the circumstances. We must conclude that for pur-

poses of determining Halco's gross income in 1973 the cost of the aluminum it purchased must be deducted from its gross receipts.

With respect to the second issue, the Board takes the position that the currency gain realized by Halco cannot be considered holding company income because currency gain is not specifically mentioned as an item of gross income. It is Halco's position that the currency gain attributable to revaluation arising while Halco held blocked foreign currency derived from the liquidation of its subsidiary is gain from the underlying transaction (*i.e.*, the sale of stock in liquidation of Halco's interest in its subsidiary).

This is also an issue of first impression for which there is a dearth of even analogous case law. The key to resolving the issue we believe is the determination of whether or not there were actually one or two transactions involved here. The Board contends that the sale of the stock in 1972 was one transaction and the currency exchange was a separate and distinct transaction occurring in 1973 and because gain from currency exchange is not listed in the relevant section it cannot be considered gross income. In advancing this position, we believe that the Board is overlooking a key factor: the fact that the delay in making the currency exchange was not a violational one or one separate from the initial agreement. The delay was in fact *part* of the initial agreement. In the stipulation of fact, the Board has agreed that Halco was prohibited from exchanging the sylis it received as part of the initial liquidation. While conceding that the Guinean currency initially received by Halco *was* holding company gross income, the Board now wants to change the characterization of that income when Halco, pursuant to the *same* agreement and at the earliest possible date, converted the currency to United States dollars. We believe the Board's posi-

tion is untenable and hold that the currency gain must be properly included in the gross income figure. We would hasten to add, however, that our decision here is a narrow one dealing only with the unique characteristics of "blocked currency" and our holding is limited to the peculiar facts of the instant case.

For the foregoing reason the order of the Board of Finance and Revenue is reversed and the Department of Revenue is hereby ordered to recalculate the 1973 Pennsylvania Franchise tax liability of Halco (Mining) Inc. consistent with this opinion.

ORDER

AND Now, this 20th day of May, 1980, unless exceptions are filed within thirty (30) days of the date hereof, the order of the Board of Finance and Revenue in the above-captioned matter is hereby reversed and the Department of Revenue is ordered to recompute the 1973 Pennsylvania Franchise tax liability of Halco (Mining) Inc. in accordance with this opinion.

President Judge BOWMAN did not participate in the decision in this case.

Judge WILKINSON, JR. dissents.